THE ELECTIONS REVIEW COMMITTEE OF THE EIGHTH
UTILITIES DISTRICT *v.* FREEDOM OF INFORMATION
COMMISSION, ET AL.
(14264)

PETERS, C. J., SHEA, CALLAHAN, GLASS and BORDEN, Js.

---

Argued May 29—decision released July 30, 1991

*Constance L. Chambers,* assistant general counsel, for the appellant (named defendant).

*Dan E. LaBelle,* for the appellee (plaintiff).

BORDEN, J. The dispositive issue in this administrative appeal is whether the plaintiff, the elections review committee of the eighth utilities district (ERC), an ad hoc committee composed of one district director and three volunteer electors, is a public agency within the meaning of General Statutes § 1-18a (a).[1] Section 1-18a (a) was amended by No. 83-372[2] of the 1983 Pub-

---

[1] General Statutes § 1-18a (a) provides: " 'Public agency' or 'agency' means any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official or body or committee thereof but only in respect to its or their administrative functions."

[2] The effect of No. 83-372 of the 1983 Public Acts was to add the following italicized language to General Statutes § 1-18a (a): " 'Public agency' or 'agency' means any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, *any department, institution, bureau, board, commission, authority or offi-*

lic Acts to include in the definition of a "public agency" any "committee" of a public agency. We conclude that the legislature, in amending § 1-18a (a), intended the term "committee" to encompass only a committee that is a subunit of the public agency that established it and, accordingly, affirm the judgment of the trial court.

The material facts are undisputed. The eighth utilities district (district) is the corporate and political body responsible for providing sanitary, sewer and fire services for the town of Manchester. The district is governed by a board of seven members, consisting of a president and six directors. The parties do not dispute that the district, including the board, is a public agency within the meaning of § 1-18a (a). After the annual meeting of electors for the district in May, 1988, the district board established the ERC to study the procedures of the annual meeting in order to expedite that process and to obtain greater participation by the electors.

The committee appointed was composed of one district director and three volunteer electors who held no office in the district. The ERC was requested to file a report with the district, but it had no authority to change the procedures of the annual meeting or to alter any provisions of the by-laws. The ERC met on several occasions, publishing notice of each meeting. Although one member of the ERC, Ellen Burns Landers, the district director, kept informal notes of the meetings, the ERC did not keep minutes and did not follow all of the requirements of the Freedom of

---

cial of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, *including any committee of any such office, subdivision, agency, department, institution, bureau, board, commission or official,* and also includes any judicial office, official or body *or committee thereof* but only in respect to its or their administrative functions." (Emphasis in original.)

Information Act (FOIA); General Statutes §§ 1-7 through 1-21k; for meetings of public agencies. See General Statutes § 1-21.[3]

[3] General Statutes § 1-21 provides: "MEETINGS OF GOVERNMENT AGENCIES TO BE PUBLIC. RECORDING OF VOTES. SCHEDULE AND AGENDA OF MEETINGS TO BE FILED. NOTICE OF SPECIAL MEETINGS. EXECUTIVE SESSIONS. (a) The meetings of all public agencies, except executive sessions as defined in subsection (e) of section 1-18a, shall be open to the public. The votes of each member of any such public agency upon any issue before such public agency shall be reduced to writing and made available for public inspection within forty-eight hours and shall also be recorded in the minutes of the session at which taken, which minutes shall be available for public inspection within seven days of the session to which they refer. Each such public agency of the state shall file not later than January thirty-first of each year in the office of the secretary of the state the schedule of the regular meetings of such public agency for the ensuing year, except that such provision shall not apply to the general assembly, either house thereof or to any committee thereof. Any other provision of sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, notwithstanding, the general assembly at the commencement of each regular session in the odd-numbered years, shall adopt, as part of its joint rules, rules to provide notice to the public of its regular, special, emergency or interim committee meetings. The chairman or secretary of any such public agency of any political subdivision of the state shall file, not later than January thirty-first of each year, with the clerk of such subdivision the schedule of regular meetings of such public agency for the ensuing year, and no such meeting of any such public agency shall be held sooner than thirty days after such schedule has been filed. The chief executive officer of any multitown district or agency shall file, not later than January thirty-first of each year, with the clerk of each municipal member of such district or agency, the schedule of regular meetings of such public agency for the ensuing year, and no such meeting of any such public agency shall be held sooner than thirty days after such schedule has been filed. The agenda of the regular meetings of every public agency, except for the general assembly, shall be available to the public and shall be filed, not less than twenty-four hours before the meetings to which they refer, in such agency's regular office or place of business or, if there is no such office or place of business, in the office of the secretary of the state for any such public agency of the state, in the office of the clerk of such subdivision for any public agency of a political subdivision of the state or in the office of the clerk of each municipal member of any multitown district or agency. Upon the affirmative vote of two-thirds of the members of a public agency present and voting, any subsequent business not included in such filed agendas may be considered and acted upon at such meetings. Notice of each special meeting of every public agency,

On March 29, 1989, the defendant Perry Dodson, an elector of the district, filed a request with the district clerk to examine the minutes of the meetings of the

except for the general assembly, either house thereof or any committee thereof, shall be given not less than twenty-four hours prior to the time of such meeting by filing a notice of the time and place thereof in the office of the secretary of the state for any such public agency of the state, in the office of the clerk of such subdivision for any public agency of a political subdivision of the state and in the office of the clerk of each municipal member for any multitown district or agency. The secretary or clerk shall cause any notice received under this section to be posted in his office. Such notice shall be given not less than twenty-four hours prior to the time of the special meeting; provided, in case of emergency, except for the general assembly, either house thereof or any committee thereof, any such special meeting may be held without complying with the foregoing requirement for the filing of notice but a copy of the minutes of every such emergency special meeting adequately setting forth the nature of the emergency and the proceedings occurring at such meeting shall be filed with the secretary of the state, the clerk of such political subdivision, or the clerk of each municipal member of such multitown district or agency, as the case may be, not later than seventy-two hours following the holding of such meeting. The notice shall specify the time and place of the special meeting and the business to be transacted. No other business shall be considered at such meetings by such public agency. In addition, such written notice shall be delivered to the usual place of abode of each member of the public agency so that the same is received prior to such special meeting. The requirement of delivery of such written notice may be dispensed with as to any member who at or prior to the time the meeting convenes files with the clerk or secretary of the public agency a written waiver of delivery of such notice. Such waiver may be given by telegram. The requirement of delivery of such written notice may also be dispensed with as to any member who is actually present at the meeting at the time it convenes. Nothing in this section shall be construed to prohibit any agency from adopting more stringent notice requirements. No member of the public shall be required, as a condition to attendance at a meeting of any such body, to register his name, or furnish other information, or complete a questionnaire or otherwise fulfill any condition precedent to his attendance. A public agency may hold an executive session as defined in subsection (e) of section 1-18a, upon an affirmative vote of two-thirds of the members of such body present and voting, taken at a public meeting and stating the reasons for such executive session, as defined in said section.

"(b) In determining the time within which or by when a notice, agenda or other information is required to be given, made available, posted or filed, under subsection (a), Saturdays, Sundays, legal holidays and any day on

ERC.[4] Not having received a response from the ERC, Dodson, on April 12, 1989, filed a petition for a hearing with the freedom of information commission (FOIC), claiming, inter alia, that the failure of the ERC to provide him with the minutes of its meetings was a violation of the FOIA because § 1-18a (a) provides that "committees" of public agencies are likewise public agencies and, therefore, are subject to the requirements of the FOIA. Although Landers thereafter provided Dodson with a transcribed copy of her informal notes, Dodson did not receive the formal minutes of the meetings that he had requested.

At the hearing before the FOIC, the ERC claimed that it was not subject to the requirements of the FOIA mandating that minutes of meetings be maintained because it was not a public agency within the meaning of § 1-18a (a). Specifically, the ERC claimed that, because all of the committee members were not members of the district board, the public agency that created the ERC, and because it did not possess decision-making authority, it did not constitute a public agency pursuant to § 1-18a (a). The FOIC held, however, that because the ERC was a committee of the district board,

---

which the office of the agency, the secretary of the state or the clerk of the applicable political subdivision or the clerk of each municipal member of any multitown district or agency, as the case may be, is closed, shall be excluded."

[4] Dodson requested, in particular: (1) copies of the minutes of all meetings of the eighth utilities district elections review committee; (2) copies of all surveys taken, including polls, and the results of any such polls; (3) copies of all written correspondence by electors concerning revisions to the eighth utilities district electoral process; and (4) copies of all decisions of the elections review committee regarding the eighth utilities district electoral process.

The ERC provided Dodson with a transcribed copy of informal notes taken by Landers, and informed Dodson that no polls were taken, no written correspondence was received, and no minutes were taken at the meetings. At the hearing before the FOIC, Dodson alleged that the ERC failed to provide him with proper minutes of all of its meetings.

which is a public agency, the committee is also a public agency under § 1-18a (a), and, therefore, subject to the provisions of the FOIA. The FOIC ordered the ERC to reconstruct the minutes of its meetings, to provide Dodson with a copy of the minutes and henceforth to comply with the requirements of §§ 1-19 (a) and 1-21 (a).[5]

The ERC appealed to the Superior Court, which sustained the appeal, concluding that the legislature, in amending § 1-18a (a) to include committees as public agencies, intended "committee" to refer only to subunits composed of the respective public agency members, and not to a "committee" composed of some or all persons who are not agency members. The FOIC appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023.

The FOIC claims that the trial court improperly concluded that the ERC is not a public agency within the meaning of § 1-18a (a) because: (1) the term "committee" is unambiguous and, therefore, the trial court improperly construed its meaning to exclude the ERC; and (2) even if the term "committee" were ambiguous such that it required construction, (a) the court failed to defer to the construction of the term by the FOIC, and (b) the court failed properly to ascertain the intent

---

[5] The order entered by the FOIC provided: "1. To the extent possible, the respondent forthwith shall reconstruct minutes of its meetings between September 7, 1988 to November 14, 1988 inclusive, which shall reflect the time, date, and place of each meeting, the identities of the respondent's members present at the meeting, the time when each member arrived at and departed from the meeting, and the business transacted and how each member voted on each decision and recommendation.

"2. The respondent forthwith shall both provide the complainant with these minutes and file them with the district clerk.

"3. Henceforth, the respondent shall act in strict compliance with the requirements of §§ 1-19 (a) and 1-21 (a), G.S. . . . recording of proper minutes and the filing of these minutes within the appropriate time period."

of the legislature in enacting No. 83-372 of the 1983 Public Acts. We conclude that the statutory language of § 1-18a (a) is not absolutely clear and that the term "committee" was intended by the legislature only to include as public agencies committees that are subunits of the public agencies that create them.

The question whether the legislature intended a committee such as the ERC to be subject to the provisions of the FOIA when it enacted No. 83-372[6] of the 1983 Public Acts presents an issue of statutory interpretation and, therefore, is a question of law. *Connecticut Humane Society* v. *Freedom of Information Commission,* 218 Conn. 757, 761, 591 A.2d 395 (1991). "The objective of statutory construction is to give effect to the intended purpose of the legislature." *State* v. *Delafose,* 185 Conn. 517, 521, 441 A.2d 158 (1981). It is axiomatic that, where the statutory language is clear and unambiguous, construction of the statute by reference to its history and purpose is unnecessary. *Winslow* v. *Lewis-Shepard, Inc.,* 216 Conn. 533, 538, 582 A.2d 1184 (1990). That axiom only applies in full force, however, "[w]here . . . the language of a statute is . . . *absolutely* clear" on its face and where no ambiguity is raised in applying the statute in a particular case. (Emphasis in original.) *Anderson* v. *Ludgin,* 175 Conn. 545, 554, 400 A.2d 712 (1978); see also *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* 3 Conn. App. 432, 437–38, 489 A.2d 398 (1985), aff'd, 200 Conn. 630, 513 A.2d 52 (1986).

On appeal, the FOIC first argues that the language of § 1-18a (a) is unambiguous, and, therefore, the trial court's reference to the legislative history was improper. *University of Connecticut* v. *Freedom of Information Commission,* 217 Conn. 322, 328, 585 A.2d 690 (1991).

---

[6] See footnote 2, supra.

We disagree, however, that the language of the statute in question is "absolutely clear"; (emphasis omitted) *Anderson* v. *Ludgin,* supra, 554; when considered together with the rest of the statute and its background. A "committee" has been defined as "a body of persons delegated to consider, investigate, or take action upon and [usually] to report concerning some matter or business . . . ." Webster's Third New International Dictionary.[7] Thus, although the ERC is a "committee" within the ordinary dictionary definition, it is unclear from an examination of the text of the statute whether the legislature intended the phrase "including any committee *of* any such office, subdivision, [etc.] . . . ." (emphasis added) to encompass a committee that is composed of some or all persons who are not agency members. A "committee of" an agency would include a body composed solely of nonmembers of the agency to whom the agency had assigned a particular task only if the use of the possessive preposition were equivalent to "created by." Under such a construction, even one person, wholly unassociated with the agency except for the project assigned to him for study and recommendation, such as an outside consultant, would constitute a "committee of" the agency. A narrow interpretation would limit that term to a committee composed exclusively of agency members or including a majority of agency members. Within these outer bounds of the term are those committees, like the ERC, that include one or more, but not a majority of agency members.

"When application of the statute to a particular situation reveals a latent ambiguity in seemingly unambiguous language . . . we turn for guidance to the

[7] At the same time, the same authority defines the word in a legislative context as "a body *of members* chosen by a legislative body to give special consideration to pending legislation or to other legislative matters." (Emphasis added.) Webster's Third New International Dictionary.

purpose of the statute and its legislative history to resolve that ambiguity." *University of Connecticut* v. *Freedom of Information Commission,* supra, 328. Therefore, we now examine other sources of possible enlightenment, namely, the history, purpose, objective and underlying policy of the statute. *Anderson* v. *Ludgin,* supra, 552–53; see also *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* supra, 438.

The FOIC claims that, should we conclude that § 1-18a (a) requires construction, then the trial court failed properly to ascertain the intent of the legislature in enacting No. 83-372 of the 1983 Public Acts. After an examination of the relevant legislative history, we disagree.

While we agree with the trial court that much of the history of No. 83-372 of the 1983 Public Acts "is not too helpful,"[8] our review discloses that Representative John W. Atkin, who reported the bill onto the floor of the House of Representatives, in addressing the underlying purpose and rationale of the bill, explicitly referred to the testimony of Mitchell Pearlman, the executive director and general counsel of the FOIC, at the legislative committee hearing. Atkin stated that, as "pointed out" by Pearlman, the purpose of the bill was to resolve a divergence between two trial court decisions concerning whether certain committees of public agencies are bound by the FOIA.[9] 26 H.R. Proc.,

---

[8] A great deal of the discussion in the House of Representatives concerned various amendments to the bill that are not relevant to this appeal.

[9] Representative John W. Atkin stated that the "bill is a fairly simple measure. It simply changes the definition of public agency. It's been pointed out by Mr. [Pearlman], [general counsel] of the FOI[C], that what is happening in terms of subcommittees of public agencies is that sub-committees are appointed and there are two differing opinions that have gone through the courts as to whether they are indeed full committees or not and whether they have to fall under FOI[A] requirements." 26 H.R. Proc., Pt. 4, 1983 Sess., p. 1348.

Pt. 4, 1983 Sess., p. 1348. "Statements made on the floor of the House, although not controlling, may be judicially noticed and are a strong indication of legislative intent." *Manchester Sand & Gravel Co.* v. *South Windsor,* 203 Conn. 267, 276, 524 A.2d 621 (1987). Therefore, the statement of Atkin on the floor of the House incorporating the testimony of Pearlman is a strong indication that the legislature intended to adopt the amendment as described by and for the purposes stated by Pearlman.

We turn, therefore, to the testimony of Pearlman in the legislative committee hearing in an attempt to glean a degree of clarity regarding the legislature's intent in adding the phrase "including any committee" to the definition of "public agency."[10] Pearlman explained that the FOIC had been interpreting the FOIA "so that the sub-units . . . come within the definition of public agency . . . ." Conn. Joint Standing Committee Hearings, Government Administration and Elections, Pt. 1, 1983 Sess., p. 178. Pearlman went on to explain that two trial court decisions had come to conflicting conclusions concerning whether these committees of public agencies were subject to the FOIA.

In particular, Pearlman testified that "[o]ne court believes that sub-units of public agencies, these are

---

[10] Although we generally restrict our review of a statute's legislative history to the discussions conducted on the floor of the House of Representatives or of the Senate, we will consider such committee hearing testimony of individuals addressing the proposed enactment when such testimony provides particular illumination for subsequent actions on proposed bills, such as in this instance. See *In re Jessica M.,* 217 Conn. 459, 472 n.10, 586 A.2d 597 (1991); see also *State* v. *Magnano,* 204 Conn. 259, 273–74 n.8, 528 A.2d 760 (1987) (testimony from legislative committee useful to illuminate "the problem or issue which the legislature sought to resolve, and the purpose it sought to serve, in enacting a statute"). This case presents an excellent example of a situation where the underlying intent of the legislature can be illuminated because of the direct reference to Pearlman's testimony by Atkin on the floor of the House.

really essentially committees or subcommittees, whatever they're designated, where the committees are composed of less than a quorum of the entire public agency, are not subject to the FOI[A] law. As a result, we've had any number of public agencies, as a matter of design, have been setting up committees or subcommittees composed of less than a quorum. Typically they would reflect the same ratio of partisan membership as [the] entire body and that they would use these committees and subcommittees to do the fact-finding, the recommendation, the spade work for whatever legislation." Conn. Joint Standing Committee Hearings, Government Administration and Elections, Pt. 1, 1983 Sess., p. 178. Atkin, in describing the bill, specifically referred to the divergence of opinion in the courts as testified to by Pearlman.

The examples Pearlman used to demonstrate the problem that the bill would resolve further clarify the intent of the legislature. Pearlman discussed three cases. The first involved a subcommittee[11] of the board of education of the town of North Haven. The subcommittee had refused to allow a fellow board member to attend a curriculum meeting because her attendance would have constituted a quorum, thereby requiring it to follow the provisions of the FOIA. It is clear from the use of the term "quorum"[12] that the subcommittee at issue was a subunit of board members. Second, Pearlman discussed a subcommittee of the board of education of the city of Bristol that met concerning the closing of a school. Although not specifically stated, the

---

[11] We note that throughout the discussions in the committee hearing, in the House of Representatives and in the Senate, the terms "committee," "subcommittee" and "sub-units" were used interchangeably and without any obvious distinction intended.

[12] A "quorum" is defined as "[t]he minimum number of officers and members of a committee or organization, usually a majority, who must be present for the valid transaction of business." American Heritage Dictionary (1978).

members of the subcommittee necessarily had to be members of the board of education if they possessed the authority to close a school. Pearlman finally described a subunit of the state commission on hospitals and health care. There were seventeen members of this commission, which was divided into subunits, and certain hospitals were not allowed to participate in a subcommittee hearing concerning their budgets. Conn. Joint Standing Committee Hearings, Government Administration and Elections, Pt. 1, 1983 Sess., p. 179.

All the examples provided by Pearlman involved committees comprising subunits of public agencies. His testimony reflects a concern that a public agency would set up committees composed of a number of its own members in order to conduct business without complying with the FOIA, with the public agency merely rubber-stamping the decision reached by the committee. This would preclude the public from participation in the governmental process in violation of the policy of our FOIA, namely, to keep governmental activity open to the public. *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980). The ERC, however, does not constitute such a committee or raise such a concern. Furthermore, there is no indication in the legislative history that the legislature intended a broader application of "committee" than that described by Pearlman at the committee hearing. We conclude, therefore, that in amending § 1-18a (a), the legislature intended only that committees of public agencies that are subunits composed of members of the public agency be subject to the provisions of the FOIA.[13]

---

[13] We do not hold that a public agency may avoid having to comply with the provisions of the FOIA by appointing one or more persons who are not agency members to any of its committees. The facts of this case do not support such a pretext, however, and we will address such an occurrence when it is properly before this court.

The FOIC argues that this interpretation is violative of the rule of statutory construction that deference be given to an agency's interpretation of its own legislation. *Board of Trustees of Woodstock Academy* v. *Freedom of Information Commission,* 181 Conn. 544, 551–52, 436 A.2d 266 (1980). This argument is of no merit. We are not bound by the interpretation of an agency on questions of law, such as the interpretation of a statute. *University of Connecticut* v. *Freedom of Information Commission,* supra, 328. Furthermore, even if the FOIC decisions cited were to be given any weight,[14] the testimony of Pearlman, the general counsel of the FOIC, gave no indication that the bill was aimed at *all* committees established by public agencies. Rather, his testimony was specifically limited to those situations where the committee is a subunit of the public agency. We are persuaded by Atkin's incorporation of Pearlman's testimony in the House of Representatives, and by the lack of any legislative history to the contrary, that No. 83-372 of the 1983 Public Acts was not intended to include committees such as the ERC under the provisions of the FOIA.

The judgment is affirmed.

In this opinion SHEA, CALLAHAN and GLASS, Js., concurred.

PETERS, C. J., dissenting. I disagree that the elections review committee of the eighth utilities district is not a "committee" and thus is not a public agency subject to the Freedom of Information Act. General Statutes §§ 1-18a through 1-21k. As I read General Statutes § 1-18a (a), it plainly includes a committee

[14] We note that two of the three FOIC decisions cited by the FOIC were rendered prior to the amendment in question and, therefore, provide no indication of the agency's interpretation of this amendment.

whose membership overlaps that of the public agency that is its creator. Even if I were persuaded, however, that the statute has some latent ambiguity, I would conclude that, in order to effectuate the regulatory purposes of the Freedom of Information Act, such a committee must conduct its business in accordance with the act's mandate for public access to deliberations about public policy. Accordingly, I respectfully dissent.

The record establishes that the elections review committee (committee) was appointed by the eighth utilities district, a public agency, to formulate recommendations for changes in the district's annual meeting procedures. The committee included one district director and three district electors. In the process of formulating its recommendations, the committee held a public hearing, but it did not otherwise comply with the requirements of the Freedom of Information Act. The gravamen of the complaint that brought this matter to the attention of the Freedom of Information Commission was the committee's failure to keep minutes of its meetings as required by §§ 1-19 (a) and 1-21 (a) of the Freedom of Information Act.

The only issue before the trial court, and before this court, is whether the requirements of the Freedom of Information Act govern the activities of the elections review committee. The majority now concurs in the trial court's holding that the applicable statutory provision, § 1-18a (a), is ambiguous and that its legislative history counsels against inclusion of the elections review committee within the ambit of the statute. I disagree.

The text of § 1-18a (a) includes, as a public agency, "*any* committee of *any* such [public] agency . . . ." (Emphasis added.) It is hard for me to find any ambiguity in that all-encompassing description. As the

majority opinion notes, the elections review committee falls cleanly within the definition of "committee" contained in Webster's Third New International Dictionary: "a body of persons delegated to consider, investigate, or take action upon and [usually] to report concerning some matter or business . . . ."

Two possible sources of latent ambiguity may be conjured up in support of the contrary conclusion. On the present record, the facts show that the authority of the elections review committee did not encompass the enactment of bylaw changes for the eighth utilities district but was limited to making recommendations about such changes. That limitation on the scope of the committee's authority is a commonplace in committee functioning, which, as Webster's notes, typically focuses on preparation of a report to the appointing authority. Alternatively, on facts other than those presented by this record, a public agency might appoint a "committee" composed entirely of public-spirited citizens, who had offered to contribute their services pro bono to promote good government. Arguably, such a committee might fall outside of the scope of § 1-18a (a), because it might not be a "committee of" the public agency. The possibility that a statute might manifest some latent ambiguity in other circumstances does not, however, make it ambiguous as applied to the elections review committee. See, by way of analogy, *State* v. *Eason,* 192 Conn. 37, 46, 470 A.2d 688 (1984); *Weil* v. *Miller,* 185 Conn. 495, 500, 441 A.2d 142 (1981). I am unable to discern any other putative sources of latent ambiguity in § 1-18a (a), and the majority opinion identifies none.

Conceding ambiguity, arguendo, I am equally unpersuaded that a functional analysis of § 1-18a (a) supports excluding the elections review committee from the reach of the Freedom of Information Act. When we

are confronted with ambiguity in a statute, the canons of statutory construction require us to ascertain the apparent intent of the legislature by examining the legislative history of the statute and the circumstances surrounding its enactment, in light of the purpose it was intended to serve. *Mahoney* v. *Lensink,* 213 Conn. 548, 563, 569 A.2d 518 (1990); *Caltabiano* v. *Planning & Zoning Commission,* 211 Conn. 662, 666, 560 A.2d 975 (1989); *Rhodes* v. *Hartford,* 201 Conn. 89, 93, 513 A.2d 124 (1986).

In appraising the relevant legislative history, we must keep in mind what is at stake. If the elections review committee is entirely outside of the regulatory purview of the Freedom of Information Act, it is not only the preparation of proper minutes that will be excused. The committee, or its successor, will be free to conduct its deliberations entirely in private, having no legal obligation to conduct any public meeting whatsoever, whether its agenda be procedural reform or substantive amendment of the rules governing the authority vested in the utilities district. The eighth utilities district, in turn, upon receiving the report of the elections review committee or its successor, may vote to accept or reject the report without any public deliberations about the merits of its recommendations. For the process of getting business done, shaping the agenda is at least half the battle. No matter how well-meaning may be the intentions of the group to which that responsibility is delegated, to allow this crucial function to be conducted in deliberative proceedings from which the public may be entirely excluded is to validate a scenario that is inconsistent with the Freedom of Information Act's strong legislative policy in favor of the open conduct of government and free public access to its records. *Lieberman* v. *Board of Labor Relations,* 216 Conn. 253, 266, 579 A.2d 505 (1990); *Board of Trustees* v.

*Freedom of Information Commission,* 181 Conn. 544, 550, 436 A.2d 266 (1980); *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 328, 435 A.2d 353 (1980).

The legislative history on which the majority relies to counter this purposive construction of the 1983 amendment that added committees to the ambit of the Freedom of Information Act is the testimony of Mitchell Pearlman, the executive director and general counsel of the Freedom of Information Commission. Undeniably, Pearlman's testimony focused on committees composed of subunits of public agencies. A ready explanation for that focus is that the then litigated cases arose in that context. That the legislature shared Pearlman's concern about potential abuses arising out of committees composed entirely of public agency members does not demonstrate, to my mind, that it did not recognize the risk of a similar abuse for committees whose membership overlapped only partially with that of a public agency. Indeed, in enacting the amended § 1-18a (a), the legislature, emphasizing the importance of public access to deliberations about public policy, specifically rejected a proposal to include within the coverage of the Freedom of Information Act only those committees that are empowered to make legally binding decisions. 26 H.R. Proc., Pt. 13, 1983 Sess., pp. 4578–4628.

The Freedom of Information Act was intended to assure that public agencies in Connecticut conduct their affairs in accordance with the principles of open government. In extending that salutary principle to include committees appointed by public agencies to pursue a public agenda, the legislature intended, I believe, to include public access to the deliberations of any public committee on which any member of a public agency serves.

I respectfully dissent.