[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The issue in this case is whether Public Acts, June 1991 Special Session, No. 91-3 134, which criminalizes the sale of out-of-state lottery tickets in Connecticut, violates the Commerce CT Page 4548 clause or the Supremacy Clause of the Constitution of the United States. This court holds that the statute violates neither constitutional provision.
 I.
The defendant was served with a misdemeanor summons charging her with the crime of selling an out-of-state lottery ticket. She appeared in court and filed a motion to dismiss the charge, claiming that the statute on which her prosecution was based contravened the Commerce Clause of the Constitution of the United States. In her memorandum submitted in support of that motion the defendant explicitly stated that she "challenges this statute as void on its face, rather than as applied to her. . . ." Memorandum of Law In Support of Defendant's Motion to Dismiss, page 3 n. 1. The Connecticut Supreme Court has explicitly discountenanced adjudicating the facial validity of a statute under the Commerce Clause. State v. Zach, 198 Conn. 168, 176-178, 502 A.2d 896
(1985). "It is a settled rule of constitutional adjudication that a court will decide the constitutionality of a statute only as it applied to the particular facts at hand. State v. Madera,198 Conn. 92, 105 503 A.2d 136 (1985); State v. Pickering, 180 Conn. 54,57, 428 A.2d 322 (1980); Shaskan v. Waltham Industries Corporation, 168 Conn. 43, 49, 357 A.2d 472 (1975). A party who challenges the constitutionality of a statute must prove that the statute has adversely affected a protected interest under the facts of his particular case and not merely under some possible or hypothetical set of facts not proven to exist." Id., 176 (Internal quotation marks omitted). Neither the misdemeanor summons nor anything else of record reflected whether the state claimed that the defendant had sold a ticket for a private unauthorized lottery or for a lottery duly authorized and operated by a sister state. Such matters are relevant to a determination of the statute's validity. Therefore, the court declined to act on the defendant's motion to dismiss. Cf. id., 178.
At the court's suggestion the state filed an "information". See Practice Book 615 et seq. The State's information "charges that at the City of New Haven on or about the 26th day of October 1991 the said Cindy Ader sold, delivered, advertised, or offered for sale to another person for a fee, two lottery tickets from the State of Florida Lottery, in violation of Public Act 91-3, 134." That statute, hereinafter referred to as 134, provides: "(a) A person is guilty of sale of an out-of-state lottery ticket when he sells, delivers, advertises or offers for sale in this state, for a fee, any lottery ticket for any out of state lottery game. (b) sale of an out-of-state lottery ticket is a class A misdemeanor." The defendant has filed a "Revised Motion to Dismiss" claiming that the statute on which her prosecution is based violates both the Commerce Clause and the Supremacy Clause of the Constitution of the CT Page 4549 United States. A motion to dismiss an information is the appropriate vehicle by which to "[c]laim that the law defining the offense charged is unconstitutional or otherwise invalid. . . ." Practice Book 815(8).
 II. A.
"The Commerce Clause grants to Congress the power `[t]o, regulate Commerce . . . among the several states. U.S. Constit., Art. 1, 8 I.3. Although the Clause thus speaks in terms of power bestowed upon Congress, the [United States Supreme] Court long has recognized that it also limits the power of the States to erect barriers against interstate trade. See, e.g., Hughes v. Oklahoma,441 U.S. 322, 326 (1979); Philadelphia v. New Jersey, 437 U.S. 617,623 (1978); H. P. Hood Sons, Inc. v. DuMond, 336 U.S. 525, 534-538
(1949); Cooley v. Board of Wardens, 12 How. 299 (1852)." Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35-36, 100 S.Ct. 2009,64 L.Ed.2d 702 (1980). "This `negative' aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. See e.g. Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270-273 (1984); H. P. Hood Sons., supra, at 532-533; Guy v. Baltimore, 100 U.S. 434, 443 (1880)." New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273-274, 100 S.Ct. 1803,100 L.Ed.2d 302 (1988).
The state argues that 134 is a legitimate exercise of Connecticut's police power and that this puts an end to the defendant's constitutional challenge. Repeatedly, the United States Supreme Court has held that a State cannot circumvent the strictures of the Commerce Clause "`by simply invoking the convenient apologetics of the police power.'" Morgan v. Virginia,328 U.S. 373, 380 (1946), quoting Kansas Southern Ry v. Kaw Valley Drainage Distr., 233 U.S. 75, 79 (1914). "[A] State may not, by its police regulations, whatever their object, unnecessarily burden . . . interstate commerce." Reid v. Colorado, 187 U.S. 137, 151,23 S.Ct 92, 47 L.Ed. 108 (1902); see Crenshaw v. Arkansas, 227 U.S. 389,399 (1913).
"This limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of `legitimate local concern,' even though interstate commerce may be affected. See e.g. Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 440 (1978); Great A P Tea Co. v. Cottrell, 424 U.S. 366, 371 (1976)." Lewis v. BT Investment Managers Inc., supra, 36; see Blue Sky Bar, Inc. v. Statford, 203 Conn. 14, 29-32, 523 A.2d 467 (1987) (local ordinance CT Page 4550 proscribing vending from a motor vehicle not violative of Commerce Clause). "Where such legitimate local interests are implicated, defining the appropriate scope for state regulation is often a matter of `delicate adjustment.' . . . Yet even in regulating to protect local interests, the States generally must act in a manner consistent with the `ultimate . . . principle that one state in its dealings with another may not place itself in a position of economic isolation.' Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511,527 (1935). However important the state interest at hand, `it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is a reason apart from their origin, to treat them differently.' Philadelphia v. New Jersey, 437 U.S. at 626-627." Lewis v. BT Investment Managers, Inc., supra.
"Over the years, the [United States Supreme] Court has used a variety of formulations for the Commerce Clause limitation upon the States, but it consistently has distinguished between outright protectionism and more indirect burdens on the free flow of trade." Lewis v. BT Investment Managers, Inc., supra. "Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down, see, e.g. Sporhase v. Nebraska ex rel Douglas, 458 U.S. 941 (1982); Lewis v. BT Investment Managers Inc., [supra]; Dean Milk Co. v. Madison, 340 U.S. 349 (1951), unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism, see, e.g. Maine v. Taylor477 U.S. 131 (1986)." New Energy Co. of Indiana v. Limbach, 486 U.S. 269,274, 108 S.CT. 1003, 100 L.Ed.2d 302 (1988). That is, "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." Philadelphia v. New Jersey, supra, 624 (emphasis in original). "In contrast, legislation that visits its effects equally upon both interstate and local business may survive a constitutional scrutiny if it is narrowly drawn." Lewis v. BT Investment Managers, Inc., supra.
Preliminarily, it is held that the sale of lottery tickets, although not currently considered to be the usual species of economic intercourse, is "commerce" within the ambit of the Commerce Clause of the Constitution of the United States. "All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset." Philadelphia v. New Jersey, 437 U.S. 617, 622 (1978). In recent years, the United States Supreme Court has overruled certain of its older cases holding otherwise, e.g. Hughes v. Oklahoma, 441 U.S. 322 (1979) overruling Geer v. Connecticut, U.S. 519 (1896) (wildlife); Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941 (1982), implicitly overruling Hudson County Water Co. v. McCarter, 209 U.S. 349
(1908) (surface water). In the Lottery Case, 188 U.S. 321, 354,23 S.Ct. 321, 47 L.Ed. 492 (1903), the interstate transportation of lottery tickets was held to be commerce and an act of Congress CT Page 4551 prohibiting such transportation was held to be within the power conferred on Congress by the Commerce Clause of the Constitution. Id., 363-364. Since the interstate transportation of lottery tickets is interstate commerce it cannot be doubted that the subsequent sale of such tickets at retail also is interstate commerce. F. T. C. v. Mandel Brothers, 359 U.S. 385, 391,79 S.Ct. 818, 3 L.Ed. 893 (1959).
The state argues that the defendant's Commerce Clause claim is controlled by State v. Harbourne, 70 Conn. 484, 40 A. 179 (1898). In that case the Connecticut Supreme Court held that a statute prohibiting the keeping of any place for the purpose of transmitting money to any race track, or other place, to be bet on a horse race did not violate the Commerce Clause. At that time, betting on horse races was a penal offense in Connecticut. Id., 490. In the instant case, however, the state has opted to sanction the sale of lottery tickets and to confer on itself a state monopoly in that activity. General Statutes 12-557b et seq.,12-568, 12-569. "[W]hen a state attempts to regulate domestic commerce in an article which it recognizes as a legitimate subject of commerce, so as to discriminate in favor of domestic commerce, and against interstate commerce in that article, the law ceases to be a pure police regulation and becomes a direct interference with interstate commerce." State v. Harbourne, supra, 492.
The state also relies on Pike v. Bruce Church, Inc., 397 U.S. 137,90 S.Ct. 844, 25 L.Ed.2d 174 (1970), in which the court stated: "Where state statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the potential local public interests." Id., 142. The state's reliance is misplaced. As to this issue, this court disagrees with the holding of the Florida court in Winshare Club of Canada v. Department of Legal Affairs, 542, So.2d 974, 975 (Fla. 1989), reh. den., which held that a Florida statute prohibiting the sale of out-of-state lottery tickets satisfied the test in Pike "since it forbids Florida and out-of-state citizens alike from selling lottery tickets and has only an incidental effect on interstate commerce." A state does not regulate evenhandedly when it employs the criminal law to ensure that only that species of items which it produces may be sold within its borders. A state cannot circumvent the Commerce Clause by conferring on itself or another monopoly power. Cf. Pensacola Tel. Co. v. Western Union Tel. Co., 96 U.S. 1,12 (1877); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23
(1824). "The very purpose of the commerce clause was to create an area of free trade among the several states." McLeod v. J. E. Dilworth Co., 322 U.S. 327, 330, 64 S.C. 1023, 1026, 80 L.Ed. 1304
(1944). CT Page 4552
Section 134 restricts interstate trade in the most direct manner possible, blocking and criminalizing all sales of out-of-state lottery tickets. See Hughes v. Oklahomas, supra, 337-338. For this reason, the statute is subject to the virtual "per se rule of invalidity [which] has been erected" against such legislation. Lewis v. BT Investment Managers, Inc., supra, 36 quoting Philadelphia v. New Jersey, supra, 624. The United States Supreme "Court has consistently found parochial legislation of this kind to be constitutionally invalid whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition; Baldwin v. G. A. F. Seelig, Inc., 294 U.S. at 522-524; or to create jobs by keeping industry within the State, Foster — Fountain Packing Co. v. Haydel, 278 U.S. 1, 10; Johnston v. Haydel, 278 U.S. 16: Toomer v Witsell, 334 U.S. at 403, 404; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, Edwards v. California, 314 U.S. 160, 173-174. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy." Philadelphia v. New Jersey, supra, 627. The settled rule is that "once a state law is shown to discriminate against interstate commerce `either on its face or in its practical effect the burden falls on the State to demonstrate both that the statute `serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means. See also e.g., Sporhase v. Nebraska ex rel Douglas, 458 U.S. 941, 957
(1982); Hunt v. Washington State Apple Advertising Comm'r,432 U.S 333, 353 (1977); Dean Milk Co. v. Madison, 340 U.S. 349, 354
(1951)." Maine v. Taylor, supra, 138, quoting Hughes v. Oklahoma, supra, 336.
 B.
Whether 134 "serves a legitimate local purpose" is a factual question which this court approaches with considerable circumspection. "The few simple words of the Commerce Clause . . . reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." Hughes v. Oklahoma, supra, 325-326. Such a cornerstone of our Union ought not be undermined by factual findings of state court judges. Nor is the care with which this court approaches the question of legislative purpose diminished by the fact that "when considering the purpose of a challenged statute, . . . [The United States Supreme] Court is not bound by `the name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law. Lacoste v. Louisiana CT Page 4553 Dept. of Conservation, 263 U.S. 545, 550 (1924); see Foster-Fountain Packing Co. v. Haydel, 278 U.S. at 10; Pike v. Bruce Church, Inc. [397 U.S. 137, 142 (1970)]." Id. 336. Moreover, given the "burden" which the United States Supreme Court has explicitly cast "on the State to demonstrate . . . that the statute `serves a legitimate local purpose'"; Maine v. Taylor, supra; this court may not indulge in the ordinary presumption of constitutionality and proper legislative motivation, invoked where the extent of the police power is in question or where a statute is subjected to "the rational basis test" under the Due Process Clause or the Equal Protection Clause. See e.g. Blue Sky Bar, Inc. v. Stratford, 203 Conn. 14, 24, 523 A.2d 467 (1987); State v. Aspinall, 6 Conn. App. 546, 550, 506 A.2d 1063 (1986).
Section 134 was one of many sections in an omnibus budget bill which pertained primarily to the appropriation of moneys and the raising of revenues. That bill, which in sections 51 to 93 also enacted a state income tax, was approved by the General Assembly after two other appropriation-revenue bills had been vetoed by the Governor. See Public Act No. 91-409, vetoed May 31, 1991, veto sustained June 5, 1991; Public Act, June Special Session, No. 91-1; vetoed June 30, 1991, veto sustained July 23, 1991; Public Act, June Special Session, No. 91-2, vetoed August 7, 1991, veto sustained October 21, 1991. In his veto message addressed to Public Act 91-409, Governor Weicker took note of Connecticut's then-"2.7 billion deficit and an economy in tatters." State of Connecticut Public and Special Acts, January, 1991, Regular Session, June, 1991, Special Sessions, Volume 3, page 1425. The Governor also stated: "It is not the nearly one billion dollars in new taxes that flaws this budget. Indeed, of itself, that is testimony to legislative courage." Ibid. In his veto message addressed to Public Act, June Special Session, No. 91-1, the Governor observed that the projected deficit had risen to 2.9 billion dollars. State of Connecticut Public and Special Acts, op. cit., volume 4, page 584. In his veto message addressed to Public Act, June Special Session, No. 91-2, the Governor stated that the spending figure proposed in that Act was $500 million shy of what was a realistic budget and that the revenue proposal therein" takes a regressive tax system and magnifies it." Id., pages 584-585.
Two weeks after the Governor's veto of Public Acts, June Special Session, No. 91-2, the General Assembly enacted the appropriation — revenue bill which contains 134, at issue in this case. These events are not direct evidence of the legislature's purpose in enacting 134. Nonetheless, they do reflect the historical circumstance of an unmistakable and serious fiscal crisis in which the General Assembly enacted the legislation which contained 134. Cf. Zemel v. Rusk, 381 U.S. 1,8-11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Great Northern Dry CT Page 4554 Co. v. United States, 315 U.S. 262, 273, 62 S.Ct. 529, 533,86 L.Ed.2d 836 (1942), ("`courts, in construing a statute, may with propriety recur to the history of the times when it was passed.'"). That 134, which protects Connecticut's state lottery from any competition, was contained in a bill, a principle purpose of which was to raise revenues, does not militate in favor of the state's claim that 134 "serves a legitimate local purpose".
Turning to the usual tools for ascertaining the legislature's purpose and intent, we find that "[t]he recorded legislative history reveals no substantive discussion on the floor of either house of the General Assembly" addressed to 134 of Public Acts, June Special Session, 91-3. Morgan v. Brown,219 Conn. 204, 210, 592 A.2d 925 (1991). However, the state points to the following exchange between Senator Bruce Morris and Mr. William Hickey, Executive Director of the Division of Special Revenue during committee consideration of 1990 House Bill No. 5323 "An Act Concerning Vendors of Out-Of-State Lottery Tickets":
 SEN. MORRIS: If there is a compelling need for this particular business [the sale of out-of-state lottery tickets], is in fact the reason you want to put them out of business that you fear the competition for your lottery business?
 WILLIAM HICKEY: No Sir. What we're interested in is making sure that all the lottery dealings in the State of Connecticut are monitored, they're legal, they're regulated and they're run by the Division of Special Revenue as the statutes call for.
Proceedings before the Connecticut General Assembly, Committee on Public Safety and Welfare, February 20, 1990, page 48.
Although Connecticut courts usually look "to legislative history in the form of debates that occur on the floor of the House of Representatives or the Senate, when those debates have been unilluminating, we have occasionally referred to committee testimony that is particularly probative of legislative purpose." Mahoney v. Lensink, 213 Conn. 548, 559n. 15, 569 A.2d 518 (1990); see Elections Review Committee of the Eighth Utilities District v. Freedom of Information Commission, 219 Conn. 685, 694-695n. 10, 595 A.2d 313 (1991); Morgan v. Brown, 219 Conn. 204, 211 n. 6,592 A.2d 925 (1991); In re Jessica M., 217 Conn. 459, 471-72
n. 10, 586 A.2d 597 (1991); In re Sheldon G., 216 Conn. 563, 570
CT Page 4555 n. 6, 583 A.2d 112 (1990); Thompson v. Lisbon, 209 Conn. 268, 271
n. 4 550 A.2d 894 (1988); State v. Magnano, 204 Conn. 259, 274
n. 8, 528 A.2d 760 (1987). Here, however, the committee testimony on which the state relies does not pertain to the Public Act which was enacted in 1991 and on which this prosecution is based. Rather, the state relies on the legislative history of another bill, filed in another session of the General Assembly, which was not enacted. While our courts have looked to legislative inaction as evidence of legislative acquiescence in the judicial construction of a state; Ralston Purina Co. v. Board of Tax Review, 203 Conn. 425, 439, 525 A.2d 91 (1987); the Connecticut Supreme Court has never held that committee testimony addressed to a bill which was not enacted in one legislative session is evidence of the purpose or intent of legislation passed in a subsequent legislative session. Cf. Anderson v. Ludgin, 175 Conn. 545, 554n. 8, 400 A.2d 712 (1978); but see Dawson Chemical Co. v. Rohn Haas Co., 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696,717 (1980) (Committee hearings dating back to 1948 "relevant to a full understanding of the final legislative product" in 1952). Even if this committee testimony from a prior session of the legislature were relevent, this court would not find that testimony sufficiently probative of the principal purpose motivating the General Assembly on which to base a finding.
At the hearing on the defendant's revised motion to dismiss, the court invited each party to adduce evidence in support of its position. In Maine v. Taylor, supra, such an evidentiary hearing was held by the District Court to determine whether the statute there in question served a legitimate legislative purpose and whether that purpose could not be served as well by available nondiscriminatory means. Id., 140-142. Based on the evidence there adduced the District Court made factual findings on which the United States Supreme Court relied in its determination that the statute was constitutional. Id., 151: see also Southern Pacific Co. v. Arizona, 325 U.S. 761,763-764, 771-773, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). Here, however, in the absence of any evidence whatsoever, including any legislative history on the purpose of 134, this court holds that the state has not borne its burden to demonstrate that the statute serves a legitimate local purpose.
 C.
Even if the state had proven a nondiscriminatory purpose to 134 or if such a purpose could be assumed; cf. State v. Shuster,145 Conn. 554, 560, 145 A.2d 196 (1958); such as the prevention of fraudulent lotteries victimizing Connecticut residents, the statute still would fail Commerce Clause analysis. "[T]he evil of protectionism can reside in legislative means as well as legislative ends." Philadelphia v. New Jersey, supra, 626. Even CT Page 4556 where a statute serves a legitimate local purpose, where it also discriminates against interstate commerce, "the burden falls on the State to demonstrate . . . that this purpose could not be served as well by available nondiscriminatory means." Maine v. Taylor, supra, 138.
As discussed supra, the defendant's revised motion to dismiss challenges the constitutionality of 134 as it has been applied to her. The defendant has been charged by information with selling "lottery tickets from the State of Florida Lottery." This court takes judicial notice pursuant to General Statutes52-163 of Florida statutes; see Gleason v. Thayer, 87 Conn. 248,251, 87 A. 790 (1913); Woodward's Appeal;, 81 Conn. 152, 164,70 A. 453 (1908); even though it is not required to do so since no "`authoritative sources of the foreign law, subject to inspection or verification by opposing counsel, [were] made available to the court by reference or otherwise, under the usual rules for judicial notice.'" Wood v. Wood, 165 Conn. 777, 780, 345 A.2d 5
(1974), quoting Heating Acceptance Corporation v. Patterson,152 Conn. 467, 475, 208 A.2d 341 (1965).
The statutes governing Florida's lottery are contained in chapter 24 of the Florida Statutes Annotated, (hereinafter F.S.A.). The purpose of the Act establishing the Florida lottery is to enable "the people of th[at] state to benefit from significant additional moneys for education and also enable the people of the state to play the best lottery games available." F.S.A. 24.102(1). As in Connecticut, the proceeds of the Florida lottery are intended to support improvements in public education. F.S.A. 24.102(2)(a); compare Conn. Gen. Stat.12-568(2). In Florida, there is a cabinet-level Department of the Lottery headed by a secretary appointed by the Governor subject to the confirmation of the Senate. F.S.A. 24.104(1)(a). The lottery games are operated by that department "in the manner of an entrepreneurial business enterprise" recognizing that "the operation of a lottery is a unique activity for state government and that structure and procedures appropriate to the performance of other governmental functions are not necessarily appropriate to the operation of a state lottery." F.S.A. 24.102(b). In establishing that lottery it was the intent of the Florida legislature that the department be accountable to the Legislature and the people of the state through a system of audits and reports and through compliance with financial disclosure, open meetings, and public records laws." F.S.A. 24.102(d). The Department of the Lottery is subject to oversight not only by the Governor and the Legislature but by a State Lottery Commission. F.S.A. 24.106. The Department may conduct investigations and issue subpoenas; it must submit monthly and annual reports, adopt by rule a system of internal audits, "maintain weekly or more frequent records of lottery transactions" and, inter alia, CT Page 4557 "[a]dopt rules governing the establishment and operation of the state lottery. . . ." F.S.A. 24.105. With respect to advertising of the lottery, "[i]t is the intent of the Legislature that such advertising be consistent with the dignity and integrity of the state." F.S.A. 24.107. Vendors of goods and services necessary to the operation of the lottery and retailers of lottery tickets are particularly regulated. F.S.A. 24.111, 24.112. A contract between the department and a retailer may be suspended or terminated by the department because of, inter alia, the retailer's "commission of any fraud, deceit, or misrepresentation", or "conduct prejudicial to public confidence in the lottery." F.S.A. 124.112(5). The sale of lottery tickets to certain persons, including minors or those associated with the department, is proscribed. F.S.A. 24.116, 24.117. Certain conduct, including the extension of credit by a retailer, is declared to be a prohibited act and is a crime. F.S.A. 24.118. See generally, Wm. L. Leary, "The Florida Lottery Act," 15 Fla.St.U.L.Rev. 731 (1987). To carry out the mandate of the Legislature and to effectuate the intent of the foregoing statutes the Department of the Lottery, since 1987, has promulgated extensive regulations, codified in title 53 of volume 14 of the Florida Administrative Code Annotated.
Although the defendant's motion attacks the statute only as it has been applied to her, the appropriate inquiry is not only whether nondiscriminatory means could have been employed by the Legislature with respect to the Florida lottery in order to subserve a legitimate local purpose. Rather, the question is whether such means could have been employed with respect to state operated lotteries, as opposed to private lotteries. Cf. Maine v. Taylor, supra, 146-147.
In 1974, when there already existed thirteen states operating lotteries, the Commission on the Review of the National Policy Toward Gambling reported that "[o]ne of the primary reasons for the current popularity of lotteries as a source of state revenues has been the absence of scandal attending their operation. In each of the lotteries, all tickets are fully accounted for at all times by a central computer, and a dual accounting system accounts for the flow of revenues at each step of the operation. The general mode for the operating structure for a state lottery consists of an appointed commission with advisory responsibilities, and an executive director with a free hand in running the day-to-day operation. Tickets are distributed on consignment to authorized banks and sales agents who are licensed by the state after careful scrutiny. The tickets are sent through the banks to the sales agents, and unsold tickets and revenues are returned to the state, less a 5 or 6 percent commission for the agents and 1/2 or 1 percent of gross revenue receipts. The remainder is returned as net revenue CT Page 4558 to the state after operating expenses are subtracted." "Summary of Lottery Findings" of the Commission on the Review of the National Policy Toward Gambling, reprinted in 1974. U.S. Code Cong. Ad. News 7016-7017. "In summary, lotteries appear to be a relatively benign form of gambling from a social standpoint, and no evidence of corruption in their operation has been reported." Id., 7017.
It is true that more than "twenty-two states and the District of Columbia now operate lotteries." United States v. Stuebben, 799 F.2d 225, 228 (5th Cir. 1986). While this proliferation of state lotteries may make regulation more cumbersome, "[a] state must make reasonable efforts to avoid restraining the free flow of commerce across its borders. . . ." Maine v. Taylor, supra, 147. The state has made no showing at all that whatever legitimate local purpose 134 embodies could not be subserved by reasonable regulation of the sale of lottery tickets of lotteries operated by sister states. Far from choosing the least discriminatory alternative, Connecticut has chosen to protect its residents against the dangers of non-Connecticut operated lotteries "in the way that most overtly discriminates against interstate commerce." Hughes v. Oklahoma, supra, 337-338.
 C.
"Ordinarily, at this point we would have reached the end of our inquiry." Lewis v. BT Investment Managers, Inc., supra, 44. But in this instance the state has advanced the argument that Congress has authorized the several states to prohibit sales of out-of-state lottery tickets. "Congress, of course, has power to regulate the flow of interstate commerce in ways that the States, acting independently, may not. And Congress, if it chooses, may exercise the power indirectly by conferring upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy. See H. P. Hood Sons, Inc. v. DuMond,336 U.S. at 542-543; Prudential Insurance Co. v. Benjamin,328 U.S. 408, 423-424 (1946); International Shoe Co. v. Washington,326 U.S. 310, 315 (1945)." Ibid.; see Western Southern Life Ins. Co. v. Board of Equalization, 451 U.S. 648, 652-653,101 S.Ct. 2070-75, 68 L.Ed.2d 514 (1981).
"In the late 19th century, Congress enacted legislation prohibiting the interstate transportation of lottery tickets." United States v. Steubben, 799 F.2d 225, 228 (5th Cir. 1986); see Lottery Case, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903). Today, 18 U.S.C. § 1301 prohibits the importation or interstate transportation by common carrier of lottery tickets.[1] Section 1302 prohibits the use of the mails for the transportation of lottery tickets and lottery related material.[2] Section 1303 prohibits an officer or employee of the Postal Service from CT Page 4559 acting as a lottery agent.[3] Section 1304 prohibits radio stations from broadcasting information concerning a lottery.[4]
Section 1953 prohibits the interstate transportation of wagering paraphernalia.[5] "In 1975, Congress amended 1953(b) by adding paragraph (4)"; United States v. Steubben, 799 F.2d 225, 227 (5th Cir. 1986); and enacted what now is codified as18 U.S.C. § 1307.[6] The purpose of the 1975 enactments was "to relieve states operating lotteries from the restrictions federal law then imposed." Ibid. In oral argument before this court the defendant conceded that her activities would be violative of federal law; cf. United States v. Fabrizio, 385 U.S. 263, 87 S.Ct. 457,17 L.Ed. 351 (1966); but that Congress nonetheless had not ceded jurisdiction to the states to prohibitively regulate such commerce.
Current federal lottery statutes are the progeny of legislation enacted by Congress in 1885. 28 Stat. (1895) 963. "[F]ormerly, when the sources of public revenue were fewer . . ., [lotteries] were used in some or all of the states, and even in the District of Columbia, to raise money for the erection of public buildings, making public improvements, and not infrequently for educational and religious purposes." Stone v. Mississippi,101 U.S. 814, 818, 25 L.Ed. 1079 (1879). "It was not until 1892 that the last state lottery, that of Louisiana, was prohibited effectively by statute." Treadway, Wm. E., "Lottery Laws in the United States: A Page from American Legal History," 35 A.B.A.J. 385 (1949); see Louisiana Acts 1892, No. 25, 1-4. In an early case arising under the 1895 federal law, the United States Supreme Court explained that "Congress, by that act, does not assume to interfere with traffic or commerce in lottery tickets carried on exclusively within the limits of any State, but has in view only commerce of that kind among the several States. It has not assumed to interfere with the completely internal affairs of any State, and has only legislated in respect of a matter which concerns the people of the United States. As a State may, for the purpose of guarding the morals of its own people, forbid all sales of lottery tickets within its limits, so Congress, for the purpose of guarding the people of the United States against the `widespread pestilence of lotteries' and to protect the commerce which concerns all the States, may prohibit the carrying of lottery tickets from one State to another. In legislating upon the subject of the traffic in lottery tickets, as carried on through interstate commerce, Congress only supplemented the action of those States — perhaps all of them — which, for the protection of the public morals, prohibit the drawing of lotteries, as well as the sale or circulation of lottery tickets, within their respective limits. It said, in effect that it would not permit the declared policy of the States, which sought to protect their people against the mischiefs of the lottery business, to be overthrown or discharged by the agency, of interstate commerce." Lottery Case, CT Page 4560 supra, 357 (emphasis added); see also United States v. Fabrizio, supra, 269 (one of the purposes of 18 U.S.C. § 1953 was to aid States "in the suppression of gambling where gambling is contrary to public policy"). As observed supra, "`courts, in construing a statute may with propriety recur to the history of the times when it was passed.'" Great Northern Ry. Co. v. United States,315 U.S. 262, 273, 62 S.Ct. 529, 533, 86 L.Ed.2d 836 (1992), quoting United States v. Union Pacific Ry. Co., 91 U.S. 72, 79,23 L.Ed. 224 (1876).
When Congress revisited this area of the law in 1974 and 1975 it did so because thirteen States had reversed their policies and had enacted state lotteries. Without changes in the law "the policy determinations of some States in authorizing a lottery [were] inhibited by provisions of Federal law even though the lottery functions only within that State." House Report No. 93-1517, reprinted in 4 U.S. Code Cong. Admin. News, 93rd Cong.2d Sess. 1974, pp. 7007, 7010-7011. Specifically, the federal statutes prohibiting the use of the mails or other instruments of interstate commerce prevented the efficient and legal operation of state lotteries. In the committee hearings on proposed amendments to the federal statutes, the Justice Department proposed amendments which "should permit the mailing of lottery tickets and related matter, the broadcasting or televising of lottery information, and the transportation and advertising of lottery tickets using facilities of interstate commerce when . . . the lottery activity is between two or more states each of which conducts a lottery specifically authorized by state law permitting the placing of bets on other state lotteries. . . ." Id, U.S. Code 
Admin. News at 7011. The Congress rejected this recommendation. Id., 7012; see United States v. Stuebben, 799 F.2d 225, 227-228
5th Cir. 1986).
The issue here would not be an analytically close one but for the United States Supreme Court's own observation that "[i]n the instances in which we have found such consent [by Congress to state legislation imposing otherwise unreasonable burdens on interstate commerce], Congress' `"intent and policy" to sustain state legislation from attack under the Commerce Clause' was "`expressly stated."' New England Power Co. v. New Hampshire, [455 U.S. 331], at 343 (quoting Prudential Ins. Co. v. Benjamin,328 U.S. 408, 427 (1946))." Sporhase v. Nebraska ex rel. Douglas,458 U.S. 941, 960 (1982) (footnote omitted).
Gambling, however, is different, and lotteries historically even more so. Shortly after the enactment of the statutory predecessors to what now is 18 U.S.C. § 1301-1304, the United States Supreme Court restated "that the common forms of gambling were comparatively innocuous, when placed in contrast with the widespread pestilence of lotteries." Douglas v. Kentucky, CT Page 4561168 U.S. 488, 496 (1898). Those federal statutes were enacted to "supplement" the laws of those states which had prohibited lotteries. Lottery Case, supra. The very object of those statutes was to keep gambling intrastate, in those states in which it was allowed, but to ban the activity, and all that facilitated it, from interstate commerce. It was Congress, then, that "Balkanized" the activity. When in 1974-75 it legislated again on the subject, it did so only to allow the vehicles of interstate commerce to facilitate legalized gambling solely within each state which permitted it. Moreover, it is significant that the federal legislation governs activity in and relating to interstate commerce in lottery tickets and gambling paraphernalia only up to the point that such tickets are in the hands of local retailers; the regulation of the actual retail sale of lottery tickets from a seller to a buyer is left to state law. "Although Congress has not expressly announced" that states may ban the sale of out-of-state lottery tickets within their borders and that statutes such as 134 "do not threaten its latent power to regulate interstate commerce, it is unclear how Congress could articulate that intention any more convincingly than it has done here." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 155n. 21 (1987). "There is no talismanic significance to the phrase `expressly stated,' however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91,104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984). A clear expression by Congress of approval of the state regulation is sufficient. Id., 92. In view of the purpose of the federal legislation to supplement "state law", and the clear historical circumstances in which context Congress has legislated on the unique subject of gambling, this court holds that Congress has clearly consented to state legislation such as 134, banning the sale of out-of-state lottery tickets. To this extent this court agrees with the Florida Supreme Court that "Congressional enactments on the interstate sales of lottery tickets clearly contemplate that the states may regulate purely internal lottery ticket sales as they see fit. 18 U.S.C. § 1307 (1987). See United States v. McGuire,69 F.2d 485 (2d. Cir.), cert. denied, 290 U.S. 645, 54 S.Ct. 63,78 L.Ed. 560 (1933)." Winshare Club of Canada v. Dept. of Legal Affairs, supra. To conclude otherwise would require this court to hold that 134 unconstitutionally interferes with a form of interstate commerce which Congress has criminally proscribed. "Constitutional provisions should be construed so as to avoid absurd, unjust, or unreasonable consequences." United States v. Wainer, 49 F.2d 789, 791 (W.D.Pa. 1931).
 III.
The defendant also argues that 134 is preempted by the CT Page 4562 foregoing federal statutes. Such a claim is based on article VI of the Constitution of the United States which provides in relevant part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding."
"Preemption analysis has two prongs. In order to conclude that state regulatory action has been pre-empted, it must be determined that (1) Congress has evidenced an intent to occupy the field or (2) the state regulation actually conflicts with federal law. Silkwood v. Kerr-McGree Corporation, 464 U.S. 238, 248,104 S.Ct. 615, 78 L.Ed.2d 445 (1984); Times Mirror Co. v. Division of Public Utility Control, 192 Conn. 506, 410-11, 473 A.2d 768
(1984)." Griffin Hospital v. Commission on Hospitals Health Care, 200 Conn. 489, 493-94, 512 A.2d 199 (1986), appeal dismissed, 479 U.S. 1023, 107 S.Ct. 781, 93 L.Ed.2d 819 (1986). As observed supra, the federal statutes do not govern the actual retail sale of lottery tickets from seller to buyer. For this reason alone, defendant's claim fails to satisfy either prong of preemption analysis. See e.g., Maurer v. Hamilton, 309 U.S. 598
(1940); South Carolina State Highway Dept. v. Barnwell Bros.,303 U.S. 177 (1938); Kelly v. Washington, 302 U.S. 1 (1937); Whipple v. Martinson, 256 U.S. 41, 45-46 (1921). Section 134 is not preempted by federal law. Accord, State ex inf. Danforth v. Reader's Digest Assn., 527 S.W.2d 355, 363 (Mo. 1975).
The defendant's revised motion to dismiss is denied.
BRUCE L. LEVIN JUDGE OF THE SUPERIOR COURT