## DIANE PRIVEE ET AL. *v.* NICHOL C. BURNS ET AL.

Superior Court      Judicial District of      File No. CV960395074S
New Haven

Memorandum filed June 1, 1999

*Gallagher & Calistro,* for the plaintiffs.

*Regnier, Taylor, Curran & Eddy,* for the defendants.

## I

## INTRODUCTION

BLUE, J. Connecticut's statute governing the physical examination of plaintiffs in personal injury cases, General Statutes § 52-178a, consists of two sentences that have confounded trial court judges for decades. That statute reads in full as follows: "In any action to recover damages for personal injuries, the court or judge may order the plaintiff to submit to a physical examination by one or more physicians or surgeons. No party may be compelled to undergo a physical examination by any physician to whom he objects in writing submitted to the court or judge."

Although § 52-178a was enacted in 1965, it has never been construed by a reviewing court. In the absence of appellate guidance, the trial courts are in considerable

disarray on several important questions raised by the statute. The principal questions are: (1) What is the relationship of the two sentences contained in the statute to each other? (2) Is the right of a party to object to a physician unconditional, or is such an objection subject to conditions imposed by the court? (3) If the right of a party to object is unconditional, how can the court avoid injustice to the opposing side? Conflicting lower court authority can be found on the first two questions, and the third has been generally ignored. The objection now before the court requires me to put my own shoulder to this intractable wheel. Because of the importance of the questions and the disarray (or, in the case of the third question, nonexistence) of the existing answers, I have examined the existing legal and historical sources in some detail.

It is my misfortune to discover, upon researching the issue, that I disagree with many of my judicial colleagues who have previously spoken on the issue. Most trial court opinions on this subject have tended to view the statutory text as something of a nuisance and have worked to attain laudable ends by laboring against the text rather than by crafting orders calculated to achieve those ends in ways consistent with the text. In addition, the legislative history of the statute has not been fully considered with appropriate canons of statutory construction in mind. Finally, prior opinions have failed to use the insight that can be gained from the jurisprudence governing the analogous problem of psychiatric examinations in criminal cases. If this Gordian knot is ever to be cut, it will be by use of these textual, historical, and jurisprudential tools. It is hoped that some means can eventually be found to bring the issue before a reviewing court so that the statute can, at long last, be authoritatively construed. See *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 48–51, 730 A.2d 51 (1999).

## II

## THE OBJECTION

The objection now before the court arises in the context of a garden-variety personal injury action arising out of an automobile accident. The plaintiffs, Diane Privee, Lowell Barnes and Clay Carroll, allege that they were injured in a February 3, 1995 accident, when the automobile that Privee was driving collided with an automobile driven by the defendant, Nichol C. Burns (Burns). On December 13, 1996, the plaintiffs commenced this action against Burns and Lawrence C. Burns, the owner of the car Burns was driving. Each plaintiff claims physical injury resulting from Burns' negligence.

On January 14, 1999, the defendants requested that Privee be examined by Alan Goodman, M.D. On January 22, 1999, Privee filed a written objection asserting that "[a]s a matter of right, the plaintiff asserts that she does not want to be examined by said physician." On February 12, 1999, the objection was sustained by the court (*Jones, J.*).

On February 22, 1999, the defendants served a second request for physical examination, this time requesting that Privee be examined by Peter R. Barnett, M.D. On March 4, 1999, Privee filed the objection now before the court. The objection contains two asserted bases. First, the objection states that: "Plaintiff's law firm has dealt with [Dr. Barnett] on numerous other adversarial occasions, to the degree that there is potential for a larger element of subjectivity in the formulation of his opinions [than] there would be with other qualified orthopods." Second, the objection states that "it is extremely inconvenient" for Privee to travel to Barnett's office.

The objection was heard on May 3, 1999. Privee's argument at the hearing clarified her written objection

to a considerable degree. It is clear, after argument, that her only significant objection to the proposed examination arises out of what she (or, perhaps more accurately, her attorney) perceives as Barnett's general bias against plaintiffs and for defendants. There was no suggestion that Barnett has a specific personal animosity against either Privee or her attorney. Privee additionally failed to substantiate the asserted inconvenience prong of her written objection. She lives in Milford, and Barnett's office is in Cromwell, but there was no suggestion at the hearing that she would have any significant difficulty in making the proposed journey. Her objection is squarely based on the asserted bias of the physician in question. In order to determine the merits of this objection it is helpful to examine the controlling statute in light of its historical background.

## III

### THE HISTORICAL BACKGROUND

Section 52-178a can best be understood as a discovery statute enacted against the backdrop of three separate historical trends. These trends are: (A) a growing societal acceptance of routine physical examinations by physicians; (B) the development of modern rules of pretrial discovery; and (C) the increasing use of doctors as partisan expert witnesses. Each of these trends must briefly be described.

### A

There is little question that routine physical examinations were once perceived as more intrusive than they have been perceived in modern times. This change in attitude has been particularly striking in the case of medical examinations of women. The old attitude is exemplified by *Union Pacific Railway Co.* v. *Botsford,* 141 U.S. 250, 11 S. Ct. 1000, 35 L. Ed. 734 (1891). Clara Botsford was injured when a railroad car sleeping berth

fell upon her head, and she subsequently sued the railway company for damages. The company moved the trial court for an order requiring her to submit to a surgical examination. With the characteristic decorousness of the time, the company assured the court that the examination would not "expose the person of the plaintiff in any indelicate manner . . . ." (Internal quotation marks omitted.) Id. The trial court nevertheless denied the motion, and the Supreme Court affirmed the denial on appeal. The court, using a telling gender reference, opined that: "To compel any one, and especially a woman, to lay bare the body, or to submit it to the touch of a stranger, without lawful authority, is an indignity, an assault and a trespass . . . ." Id., 252.

Although medical examinations are hardly considered inconsequential in modern society, they have unquestionably become more routine in recent times. The transformation began shortly after *Botsford* was decided. In 1896, for example, New Jersey enacted a statute authorizing the physical examination of plaintiffs in personal injury cases. The Supreme Court upheld the application of this statute at the turn of the century. *Camden & Suburban Railway Co.* v. *Stetson*, 177 U.S. 172, 177, 20 S. Ct. 617, 44 L. Ed. 720 (1900). The landmark case of *Jacobson* v. *Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905), indicates an even broader acceptance of compulsory medical intervention. In that much-cited case, the Supreme Court upheld the constitutionality of compulsory vaccination laws. Id., 39.

Medical examinations had become a familiar rite of passage to most Americans by the end of the second world war. By that time, millions of Americans had served in the armed forces and, during that experience, been subjected to medical examinations by physicians not of their own choosing. Many adults in the postwar world began to have regular physical examinations. Schoolchildren in the modern world have routinely

been given physical examinations, vision and hearing screening, dental and dermatological checks, and scoliosis examinations. *Vernonia School District 47J* v. *Acton*, 515 U.S. 646, 656, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995). Schoolchildren who participate in sports are ordinarily required to have medical examinations, and can now, under authority of *Acton*, be subjected to random urinalysis drug testing as well. Id., 665. As a result of this experience, members of our society are increasingly likely to consider a physical examination performed by a physician to be a more or less ordinary experience of everyday life.

The statement just made is, however, subject to several qualifications. First, many people are likely to find unusually intrusive medical examinations, such as psychiatric and gynecological examinations, uncomfortable or even traumatic. When examinations of this description are proposed, courts must obviously treat the issue with great sensitivity. There is no suggestion, however, that the routine orthopedic examination at issue here is an examination of this description. Second, an examination that looks routine on paper but is performed in an unprofessional manner, in, for example, a rough or insulting way, is not an examination that should be condoned by any court. There is, however, no suggestion in this case that Barnett would be anything but professional in the conduct of his examination. Third, there may be some individuals who are unusually uncomfortable with the prospect of being examined by physicians whom they have not personally selected. When such a situation is brought to the attention of the court, the court must obviously weigh this consideration in the balance as best it can. Once again, however, there is no suggestion here that Privee is a person of this description.

There is, however, another, more general qualification that must also be mentioned. Our judicial system

has long recognized an interest in personal autonomy and bodily integrity. See *Washington* v. *Glucksberg*, 521 U.S. 702, 724, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). The fact that this interest must (as *Glucksberg* itself points out) often be weighed against competing interests does not diminish the fact that the interest still exists. However routine a physical examination may be to persons who have become accustomed to such things, our society has not yet reached the point where an examination by a physician not of one's choosing can be considered a mere bagatelle. The interest in personal autonomy can doubltless be overcome by other interests in a multitude of cases, but the interest still exists and must, at a minimum, be weighed in the judicial balance.

## B

The development of modern rules of pretrial discovery is exemplified by the promulgation of the Federal Rules of Civil Procedure in 1938. This innovation meant that it was no longer necessary for trials to be "carried on in the dark" and cleared the way "for the parties to obtain the fullest possible knowledge of the issues and facts before trial." *Hickman* v. *Taylor*, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947). Fed. R. Civ. P. 35 (a) provided that: "In an action in which the mental or physical condition of a party is in controversy, the court in which the action is pending may order him to submit to a physical or mental examination by a physician." The validity of this provision was upheld in *Sibbach* v. *Wilson & Co.*, 312 U.S. 1, 61 S. Ct. 422, 85 L. Ed. 479 (1941), and *Botsford*, for all practical purposes, became an historical relic.

Connecticut did not adopt the federal model of pretrial discovery for general purposes until 1978. With respect to the specific question of medical examinations, however, Connecticut proved to be somewhat

more progressive than the federal government, rejecting the rule of *Botsford* at a comparatively early date. This was done in *Cook* v. *Miller*, 103 Conn. 267, 130 A. 571 (1925). Sophia Cook was injured by falling through a brick walk built over an old cesspool on property owned by the defendant. The trial court ordered her to submit to a physical examination over her objection. Following a verdict for the defendant, she appealed that order to the Supreme Court. On appeal, the plaintiff, in the spirit of *Botsford*, openly played the gender card. Her attorney argued that: "The body of this women plaintiff was twice subject to the embarrassing indignity of a physical examination. . . . Such examinations of a sensitive woman are more than delicate. If they are to be enforced, our courts are as good as closed to worthy women . . . ." *Cook* v. *Miller*, Conn. Supreme Court Records & Briefs, April Term, 1925, Pt. 1, p. 123 (Plaintiff's Brief p. 6).

The court was not persuaded. It viewed the issue as a discretionary matter for the trial court. "The discretionary right to make such an order would seem to flow legitimately from the right of a defendant to call an injured plaintiff as a witness and compel his testimony as to his injuries . . . ." *Cook* v. *Miller*, supra, 103 Conn. 272. The court cited Wigmore for this proposition, pointing to a passage in his famous treatise in which Wigmore had fiercely criticized the *Botsford* rule. Id. The court cited the interests of justice as well: " 'To allow the plaintiff in such cases, if he sees fit to display his injuries to the jury, to call in as many friendly physicians as he pleases, and have them examine his person, and then produce them as expert witnesses on the trial, but at the same time to deny to the defendant the right in any case to have a physical examination of the plaintiff's person, and leave him wholly at the mercy of such witnesses as the plaintiff sees fit to call, constitutes a

denial of justice too gross, in our judgment, to be tolerated for one moment.' " Id., 272–73, quoting *Wanek* v. *Winona*, 78 Minn. 98, 101, 80 N.W. 851 (1899).

The discretion given to the trial courts in *Cook* was formalized in § 168 (4) of the 1963 Practice Book. That rule provided that: "For good cause shown, the court may compel disclosure by an order . . . for the medical examination of any party to a personal injury action." In the two year interval between the promulgation of § 168 (4) and the enactment of the 1965 statute, objections to proposed medical examinations were overruled with considerable frequency. P. Shuchman, "Discovering the Law of Discovery by Low Level Investigations," 38 Geo. Wash. L. Rev. 32, 64 (1969). According to anecdotal lore, "a few physicians in the Hartford area" were frequently named as examiners, and their eventual testimony was perceived by plaintiffs' counsel as biased. Id.

## C

The development just mentioned involves a third historical trend, that of the increasing use of physicians as partisan expert witnesses. Two different tensions have been at work in the course of this development. There has, in the first place, been a philosophical struggle between the idea that a physician's expert testimony is a public good and the competing idea that a physician's time, and perhaps his knowledge, are a form of private property which the physician need not yield without appropriate compensation. There has also been an accompanying tension within the medical profession between the ideal that a medical professional's testimony should be completely objective, stating the physician's unvarnished findings, and the practical realization that, in a society consisting of human beings rather than angels, a witness who is being paid by one

side in a legal dispute is likely to give testimony favoring that side.

The philosophical struggle was nicely captured in *Buchman* v. *State*, 59 Ind. 1 (1878). Buchman was a physician subpoenaed by a defendant in a rape trial. When questioned in court, he bluntly answered: " 'I respectfully refuse to give my professional opinion without being compensated.' " Id., 2. The trial court ruled that he was entitled only to ordinary witness fees, and committed him for contempt. The Supreme Court of Indiana reversed, likening a physician's "property . . . in his professional knowledge" to an author's copyright interest in a book. Id., 11. Rulings such as this were doubtless applauded by most physicians, but they were inconsistent with earlier republican assumptions about public service. J. Mohr, Doctors and the Law: Medical Jurisprudence in Nineteenth Century America (The Johns Hopkins University Press 1993) p. 253. The triumph of free enterprise meant that any effort to adopt a Continental system of court-appointed medical investigators was doomed to failure. Id.

Once physicians began to be paid for their services by litigants, questions of bias were certain to arise. The official position of the medical profession has always been one of unbiased candor. The most influential proponent of the early nineteenth century republican view of medical testimony as a public good advocated that a medical witness "ought to put the judge and jury in possession of the *'whole truth,'* even if he be not questioned to that extent." (Emphasis in original.) T. R. Beck, Annual Address delivered before the Medical Society of the State of New-York, 7 New-York Medical and Physical Journal, pp. 2, 24 (February 6, 1828). "That was a noble idea, to be sure, in 1828, but by mid-century it would begin to founder on the shoals of openly purchased and highly selective testimony." J. Mohr, supra, p. 99. In 1868, Chief Justice Chapman of Massachusetts

charged a jury that, " 'the opinions of experts are not so highly regarded as they formerly were. . . . Many experts can be hired for the occasion. You must judge yourselves of the evidence offered you.' " Id., pp. 198–99. Both the Beck and the Chapman views continue to have their adherents, but while the Beck view doubtless represents the ideal, the Chapman view may be slightly more descriptive of the realities of litigation. At a minimum, there can be no doubt that medical witnesses, like other paid experts, are frequently *perceived* as biased by the party on the other side. This perception played an important role in the legislative history of the 1965 statute.

## IV

## THE 1965 STATUTE

Because the legislative history of the 1965 statute is not widely available, it is examined here in considerable detail. It is hoped that this will enable readers more easily to draw their own conclusions.

In 1965, Representative Paul B. Groobert of Manchester introduced House Bill No. 3757, "An Act Concerning Physical Examinations in Actions to Recover Damages for Physical Injuries." The proposed bill read as follows: "In an action to recover damages for personal injuries, if the defendant shall present to the court satisfactory evidence that he is ignorant of the nature and extent of the injuries complained of, the court, by order, shall direct that the plaintiff submit to a physical examination by one or more physicians or surgeons to be designated by the court or judge, and such examination shall be had and made under such restrictions and directions as to the court or judge shall seem proper. Any party to be examined shall, if he desires, be entitled to have such examination in the presence of his own personal physician and such relative or other person as the court may direct. No party shall be compelled to undergo a

physical examination by any doctor to whom he objects in writing; provided such objection is made in good faith."

The bill's statement of purpose was "[t]o provide that no person be required to undergo a physical examination in connection with a personal injury action by a doctor to whom he objects."

Several features of this proposed bill stand out. First, physical examinations were intended to be somewhat more difficult to obtain than had been the case under § 168 (4) of the 1963 Practice Book. Instead of "good cause shown," the defendant had to present "satisfactory evidence" of ignorance. Second, and perhaps most significantly, the examining physician was "to be designated by the court or judge." This suggests a Continental-style approach, using a court-appointed medical examiner who would, at least in theory, be truly independent. Third, the examination itself was to be "made under such restrictions and directions as to the court or judge shall seem proper." This again suggests that the examination was really to be a neutral one, directed by the court. Finally, an objection to a physical examination had to be "made in good faith." Although later judges have treated the proposed "good faith" language (subsequently deleted by the legislature) as simply stating a condition that courts would naturally impose in any event, the other distinctive features of the proposed bill suggest that this was not the case. The bill proposed a seemingly neutral examination, by a physician designated by the court under restrictions directed by the court. The proposed condition of good faith understandably required that any objection to an examination this fair and this neutral would have to be accompanied by a good reason.

The proposed bill was heard by the Judiciary and Governmental Functions Committee on April 8, 1965.

The only witness who testified on the bill was Edward Smith, a Hartford attorney and secretary of the Connecticut Trial Lawyers Association. He testified in favor of the proposed bill, while admitting some unfamiliarity with its exact text, and was questioned by Groobert, who acted as something of a Greek chorus. Their dialogue is set forth in the footnote.[1] The bill was reported

[1] "Mr. Ed Smith: . . . Now, I was taken by surprise and I don't have the bill before me, but in discussion of it I think this simply permits the plaintiffs in a case to have a choice with regard [to] the names of doctors who are to examine the plaintiffs for the usual defendant insurance companies. I think it is pretty obvious that in many instances there are reasons why a plaintiff['s] attorney would not want an examination by a specific doctor and either because of his own relationships or past experience or the experience of others he would feel that the plaintiff has the right to be examined of their common cho[o]sing.

"Rep. [Paul] Groobert: I just want to ask something of your experience and other members of the Bar, particularly those involved in person[al] injury cases. As such, has it been your experience that certain insurance companies, in this area at least, use one and [the] same doctor or perhaps two, for medical examinations in all cases?

"Mr. Ed Smith: You have just hit the nail on the head, Representative Groobert!

"Rep. Groobert: Well, do you agree with that?

"Mr. Ed Smith: That is correct. Regardless of what his specialty may be they have found that, let's put it bluntly, they have found that he thinks the way they do and he is called in consistently to examine regardless of the type of injury.

"Rep. Groobert: Now, as a general rule, the tenor of the reports issued by these doctors, would you say they tend to underestimate the nature and extent of the injuries?

"Mr. Ed Smith: Constantly.

"Rep. Groobert: I've heard it said often that in some cases there has been some abuse directed against people who have to subject themselves to this examination. Do you have any evidence of that?

"Mr. Ed Smith: Yes, I do. In my own experience and in the experience of fellow members of this Association it has been extensive where there has actually been brutal abuse. (inaudible) A waiting for a matter of two hours beyond the time the appointment was made by the injured individual to be examined. This is the type of harassment and implication on the part of a doctor who is so constituted. Thank God there are not too many of them but this is what this bill is about.

"Rep. Groobert: You, as an attorney, would you permit your [clients'] personal injury cases to be examined by any doctor or would you object to some of these doctors?

out by the committee with only minor changes in phraseology.

On June 1, 1965, the proposed bill reached the House floor. The only statement on the legislation in question was made by the representative moving acceptance, Representative Benjamin M. Schlossbach of Westbrook, who remarked as follows: "Mr. Speaker, in many examinations and damages of personal injuries the defendant presents the court or the judge satisfactory evidence that he is ignorant to the nature and the extent of the injuries—the court may order a physical examination. It also gives him the right to have his own personal physician if he doesn't agree. It's a good bill. Thank you." 11 H.R. Proc., Pt. 5, 1965 Sess., p. 2635. The bill passed the House by unanimous vote.

On June 7, 1965, the bill reached the Senate floor. At that point, it was dramatically amended into the law that remains on our statute books today. The principal evidence of the concerns that inspired this change is

---

"Mr. [Ed] Smith: By any doctor?

"Rep. Groobert: Yes, by any doctor chosen by the insurance company?

"Mr. [Ed] Smith: Well, I would feel, first of all that he's a doctor who should have a specialty in the particular type of injury that is involved, number one. In the instant situation I certainly think there are enough doctors around that the insurance company could submit a number of names of qualified men and out of these certainly I wouldn't hesitate to go along with one of them, I'm sure. Is that the point that you're trying to get at?

"Rep. Groobert: Yes. I have one more question if I might. Do you have any opinion as to whether in these cases where the companies chose one or two doctors and they come back with reports which are favorable to them, do you have a feeling that this may sometimes, if not always, delay the disposition of the case?

"Mr. [Ed] Smith: No question. No question about the delay in the disposition because you're up against a situation where there is an underestimating of value. You never will be able to get together. The defense invariably insists upon the estimates made by the doctor who plays ball with them and you just don't get together. This means you go to trial and there's your docket jammed again. One more contributing factor. Thank you." Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, Pt. 2, 1965 Sess., pp. 509–11.

the amendatory text itself. Senator Paul J. Falsey proposed an amendment that struck out everything after the enacting clause and substituted the following: "In any action to recover damages for personal injuries the court or judge may order the plaintiff to submit to a physical examination by one or more physicians or surgeons. No party shall be compelled to undergo a physical examination by any physician to whom he objects in writing submitted to such court or judge." (Internal quotation marks omitted.) Journal of the Senate, Monday, June 7, 1965, p. 1363. Senator Morgan K. McGuire stated that, "the amendment meets the objection that I had." 11 S. Proc., Pt. 6, 1965 Sess., p. 2290. Falsey then remarked that, "the amendment basically removes that language in the first few lines which would detail the appearance at the doctor's office and leaves in the main thrust of the bill." Id., p. 2291. The amendment and, subsequently, the bill as amended then passed the Senate without further discussion.

On June 8, 1965, the bill returned to the House. Representative John W. Boyd of Westport moved adoption of the Senate amendment, stating that, "this amendment changes the bill slightly." 11 H.R. Proc., Pt. 8, 1965 Sess., p. 3924. The amendment and the bill as amended then passed without further discussion.

In spite of Representative Boyd's statement that the Senate amendment "slightly" changed the bill, a comparison of the original and amended texts reveals that the Senate amendment was, in fact, substantial. The amendment, as Senator Falsey remarked, removed the proposed language regarding persons entitled to be present at the examination, but it changed much more as well. Three changes are especially notable.

First, physical examinations are made much easier to obtain. The Senate amendment removes the "satisfactory evidence" burden of proof that the House bill

had placed on defendants. Not even the "[f]or good cause shown" language of the 1963 Practice Book was retained. The amendment leaves the issuance of such orders to the seemingly unbridled discretion of the trial court.

Second, the examining physicians are no longer to be "designated by the court or judge." At least theoretically, this is the most significant change wrought by the Senate amendment. Although the amendment is silent on the question of who is to do the designating, it is clear that any idea of a truly independent court-appointed medical examiner has been abandoned. There are, instead, two different ways that designation could be accomplished consistent with the amendatory language. First, the court could issue a generic order that "the plaintiff [is] to submit to a physical examination by one or more physicians or surgeons." The defendant could then (after the generic order had been issued) designate a particular physician, and the plaintiff could, if he wished, object to that designation. This approach has not been used, at least within modern memory. Instead, an alternative approach has been adopted. The defendant names a particular physician in a proposed order attached to a motion for medical examination, and the court decides whether to grant or deny the motion after hearing any objection. If the motion is granted, the physician selected by the defendant performs the examination. If the motion is denied, the defendant tries again and names a new proposed physician. In all of these scenarios, however, the names of the proposed examiners come from the defendant rather than the court.

Third, the "good faith" requirement for objections has been deleted. This deletion was almost certainly intentional. When the Senate amendment is examined in its entirety, it is clear that the amendment was designed to transform the entire process into a real

adversarial battle. Under the original House bill, examination orders were difficult to obtain and the eventual examiner was to be designated by the court. If such an examination were ordered, a plaintiff would need good reason to object. Under the Senate amendment, however, both parties have had their hands untied. Defendants are less fettered because examination orders have been made easy to obtain, the proposed examiners are selected by litigants rather than the court, and the proposed protections that plaintiffs would enjoy in the doctor's office have been deleted. The plaintiff, in return, has been granted an unfettered veto. Both sides are allowed to come out swinging.

On October 1, 1965, the legislation, now known as Public Acts 1965, No. 477, became effective. Except for a technical revision made by Public Acts, 1982, No. 82-160, § 83, the Senate amendment of June 7, 1965, remains the law today.

## V

## THE EARLY PRECEDENT

There are two officially published trial court opinions construing § 52-178a. Both of them were filed shortly after the statute's enactment. These decisions, *LeBlanc* v. *Cambo*, 26 Conn. Sup. 338, 223 A.2d 311 (1966) *(Mignone, J.)*, and *Mulligan* v. *Goodrich*, 28 Conn. Sup. 11, 246 A.2d 206 (1968) *(Parskey, J.)*, have remained influential in spite of their age and the fact that they reach very different conclusions concerning the statute in question. Given the importance of these decisions, it is appropriate to analyze them in some detail.

## A

### *LeBlanc*

*LeBlanc*, the first published case to construe the statute, probably remains the most influential trial court

opinion on the subject because of its discussion of the statute's legislative history. The defendants in *LeBlanc* moved that the plaintiff submit to a physical examination by a specified physician, and the plaintiff objected pursuant to the recently enacted statute. Judge Mignone recited the second sentence of the statute and made the following observation: "On preliminary reading this would appear to be mandatory and permit the refusal of an examiantion by a named physician merely on the submission of a written objection. The intent of the legislature in passing this enactment must be probed and ascertained, if possible." *LeBlanc* v. *Cambo*, supra, 26 Conn. Sup. 338–39.

Judge Mignone then turned to the legislative history. He noted that the purpose of the original bill "can only be superficially gleaned from the transcript of the hearing" before the General Assembly's Committee on Judiciary and Governmental Functions. Id., 339. He then quoted at length from the remarks made at that hearing, quoted in footnote 1 of this opinion. Judge Mignone observed that the legislature eventually amended the original bill by deleting a proposed requirement that objections be "made in good faith." (Internal quotation marks omitted.) Id., 340. He nevertheless found that: "The question of good faith would appear to be inherent, nonetheless, in the provision of the statute." Id. He reasoned that: "[T]he first sentence [of the statute] . . . vests a discretion in the court or judge which must of necessity carry over into the court's decision on a motion of the plaintiff objecting to examination by a particular physician. If the effect of this statute be mandatory, then there would be no reason to have the matter come before the court on short calendar motion for the entry of a perfunctory order sustaining the objection. A reductio ad absurdum could ensue to the point that the plaintiff could object to examination by each physician selected by the defendant. It is hardly logical

to conclude that this was the intent of the enactment." Id., 340–41.

Judge Mignone concluded that the court has "an inherent discretion to decide whether the objection is reasonable and should be sustained." Id., 341. He further concluded that: "The burden of proof thereon rests with the plaintiff to show why the edict of the statute should be invoked." Id. No proof having been adduced, the objection was overruled. Id.

B

Problems with *LeBlanc*

There are several important problems with the *LeBlanc* analysis.

First, *LeBlanc* is usually cited for its recital of legislative history, but the legislative history that it recites is the wrong legislative history. Much of the *LeBlanc* opinion is taken up with lengthy excerpts from Smith's testimony before the Judiciary and Governmental Functions Committee, but this emphasis violates a well established canon of statutory construction that ordinary witness statements at committee hearings "are not accorded any weight." 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 48.10, p. 343; see *Kelly* v. *Robinson*, 479 U.S. 36, 51 n.13, 107 S. Ct. 353, 93 L. Ed. 2d 216 (1986). This is particularly the case when the statute finally enacted bears little resemblance to the proposed bill considered by the committee. *State* v. *Miranda*, 245 Conn. 209, 230–31 n.24, 715 A.2d 680 (1998). This case is quite different from a case like *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 595 A.2d 313 (1991), where the testimony of a public official was specifically referred to on the legislative floor. Id., 695 n.10. Here, in contrast, there is no evidence that the testimony in question had any

impact on the bill as ultimately amended. Judicial reliance on such testimony is plainly improper.

Second, the other side of this coin is that *LeBlanc* ignores the legislative history that actually *is* important, namely the adoption of the Senate amendment. "Adoption of an amendment is evidence that the legislature intends to change the provisions of the original bill." 2A J. Sutherland, supra, § 48.18, p. 369. There is little question in this case that the Senate intended to change the provisions of the House bill in important ways and succeeded in making such changes. An attempt to construe the 1965 statute through the prism of legislative history should focus on the Senate amendment, rather than the committee testimony, as the key part of the legislative drama.

Third, *LeBlanc*'s conclusion that, despite the Senate amendment, "[t]he question of good faith would appear to be inherent, nonetheless, in the provision of the statute"; *LeBlanc* v. *Cambo*, supra, 26 Conn. Sup. 340; is highly suspect, given the considerations discussed above. On the contrary, the requirement of good faith, while an integral part of the original House bill, was simply no longer appropriate given the substantially more adversarial character of the Senate amendment as a whole.

Fourth, *LeBlanc*'s entire approach ignores what it impliedly acknowledges to be the plain language of the statute. This approach ignores the "basic tenet of statutory construction that we rely on the intent of the legislature as that intent has been *expressed.*" (Emphasis in original.) *State* v. *Miranda*, supra, 245 Conn. 230–31 n.24. The second sentence of the statute states that: "No party may be compelled to undergo a physical examination by any physician to whom he objects in writing submitted to the court or judge." General Statutes § 52-178a. This is not an ambiguous provision. *LeBlanc* does not contend otherwise.

Fifth, although *LeBlanc* suggests that the first sentence of § 52-178a, giving the court power to "order the plaintiff to submit to a physical examination by one or more physicians or surgeons" is in conflict with the second sentence, recited above, this is not necessarily the case. The second sentence can naturally be read as a limitation of the ordering power granted by the first sentence. At the same time, however, *LeBlanc*'s reductio ad absurdum argument reads far too much into the veto power given by the second sentence. The plaintiff's veto power only extends to an immunity from actually being compelled to submit to an examination. As discussed below, the court retains the capacity to take other creative measures that will at once respect this immunity and, at the same time, ensure that the ends of justice are not frustrated.

Finally, *LeBlanc*'s placement of the burden of proof on the plaintiff is inconsistent with the usual placement of the burden of proof in motion practice. The burden of proof is ordinarily placed on the party making a motion. See *Kegel* v. *McNeely*, 2 Conn. App. 174, 179, 476 A.2d 641 (1984). The defendant is the party moving for an examination. Consequently, the burden of proof should be on the defendant.

## C

### *Mulligan*

*Mulligan*, unlike *LeBlanc*, sustains an objection to a medical examination. There is no important distinction between the factual posture of the two cases. In fact, the same proposed examiner, William B. Scoville, M.D., (supposed, in popular lore, to be the inspiration for the 1965 statute), was at issue in each case. The difference in the outcomes of the cases turned on the trial court's legal analysis. Judge (later Justice) Parskey's decision in *Mulligan* was textually driven. He explained that the "statute is in two parts. The first part gives the court

discretionary authority to order a medical examination; the second part gives the plaintiff the privilege to refuse an examination by a particular doctor." *Mulligan* v. *Goodrich*, supra, 28 Conn. Sup. 12. "The language of the first sentence speaks in discretionary terms. The language of the second sentence speaks in terms of prohibition." Id., 13. Thus, in Judge Parskey's analysis, "the thrust of the second sentence is to eliminate discretion in those instances where a plaintiff interposes a written objection to a particular physician." Id.

*Mulligan* also declined to import a good cause requirement into the second sentence of the statute. Without reference to the 1965 statute's legislative history, Judge Parskey noted that: "Had the legislature desired to make good cause an essential part of a plaintiff's objection, it does not lack the technical skills to have so stated." Id., 14. He then stated the following conclusion: "Applying § 52-178a to the present case, it appears from the oral argument that a wide range of qualified physicians who theretofore have examined for defendants are acceptable to the plaintiff George Mulligan. Under these circumstances, the court lacks the authority to compel him to submit to a physical examination by Scoville." Id.

## D

### Problems with *Mulligan*

Because *Mulligan* is driven by text, it presents fewer critical problems than *LeBlanc*, which is dismissive of text and consequently ends up chasing down a number of blind alleys. Ironically, *Mulligan*, which ignores legislative history, is more faithful to that history than *LeBlanc*, which devotes its attention to the wrong legislative history. There are, however, two problems with *Mulligan* that ought to be noted.

First, *Mulligan's* final passage, quoted above, seems to pull the punch conveyed by the remainder of the

opinion. If the right of a plaintiff to object to a proposed examiner is categorical, as the bulk of the opinion (and the statutory text) seem to say, why does Judge Parskey say that *"[u]nder these circumstances"*; id.; the court lacks the authority to compel the plaintiff to submit to the examination in question? The opinion does not provide the answer to this question. It seem unlikely that the decision is based on some sort of balancing test. If that were the case, the opinion's rather forceful, and categorical, textual analysis would be beside the point. The more likely answer is that Judge Parskey viewed *Mulligan* as a case involving a modern urban area with plenty of physicians to go around and, judiciously, did not attempt to give an advisory opinion on a hypothetical case involving a paucity of available physicians. A case of that description could safely be left for another day.

Second, the fact that *Mulligan* chooses to limit its discussion to the motion in question means that it, like *LeBlanc*, does not explore alternative measures to secure the ends of justice in a way consistent with the statutory texts. As a result of this limited focus, the reductio ad absurdum posited by *LeBlanc*, has remained an active judicial concern to the present day.

## VI

### THE 1978 PRACTICE BOOK

Section 168 of the 1963 Practice Book was substantially amended in 1978. Practice Book § 13-11 (b) now provides that: "In the case of an action to recover damages for personal injuries, any party adverse to the plaintiff may file and serve . . . a request that the plaintiff submit to a physical or mental examination at the expense of the requesting party. That request shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made. Any such request shall be complied

with by the plaintiff unless, within ten days from the filing of the request, the plaintiff files in writing an objection thereto specifying to which portions of said request objection is made and the reasons for said objection. The objection shall be placed on the short calendar list upon the filing thereof. The judicial authority may make such order as is just in connection with the request. No plaintiff shall be compelled to undergo a physical examination by any physician to whom he or she objects in writing."

Although the amended rule addresses the mechanics of the motion and objection procedure in considerable detail, it does not attempt to alter the substantive rights of the competing parties. The defendant continues to have the right to propose an examining physician, and the plaintiff continues to have the right to object. Consistent with *Mulligan's* analysis, the power of the court is described in discretionary terms, while the right of the plaintiff is described in terms of prohibition. Significantly, the "good cause" language in § 168 (4) of the 1963 Practice Book has been dropped entirely.

## VII

## RECENT SUPERIOR COURT DECISIONS

No Superior Court opinion on the subject filed in the two decades following *Mulligan* has been discovered. There is some empirical evidence that *LeBlanc* was not immediately persuasive. In the aftermath of the 1965 statute, "[o]nly two of ten judges ruling on . . . an objection ordered an examination by a physician to which the plaintiff had objected. . . . The other eight cases were decided by eight different judges and all perfunctorily sustained the objection." P. Shuchman, supra, 38 Geo. Wash. L. Rev. 64. Beginning in 1988, however, a number of Superior Court judges have issued numerous decisions accompanied by unofficially

reported opinions. These opinions fall into three categories: (1) pragmatic decisions that attempt to construe the statute in order to attain results thought to be fair; (2) constitutional opinions by Judge (now Chief Justice) McDonald[2] that restrictively construe the text of the statute's second sentence to avoid constitutional difficulties; and (3) opinions adhering to the *Mulligan* analysis. These categories will be reviewed in turn.

## A

### The Pragmatic Approach

*Fabozzi* v. *National Railroad Passenger Corp.*, Superior Court, judicial district of New Haven, Docket No. 245450 (October 25, 1988) (3 C.S.C.R. 899) (*Corradino, J.*), the first decision in the new wave, is probably the most influential recent opinion in the pragmatic category. Judge Corradino reasoned that the first sentence of § 52-178a requires some qualification of the second sentence. "If the plaintiff agrees to the examination, there would be no occasion for an order; an order by the court would only materialize if the plaintiff refused an examination; thus the statute would seem to contemplate some circumstances in which the court can order such an examination despite the plaintiff's protestations." Id., 900. Reading the statute "in a common sense way," Judge Corradino found that "the good faith requirement should be held to be implicit in Section 52-178a." Id. *LeBlanc* and the final passage in *Mulligan* were cited as authority for this conclusion. In the end, however, *Fabozzi* proves to be more deferential to plaintiffs' objections based on asserted bias than *LeBlanc*. Instead of placing the burden on the plaintiff to prove the presence in good faith, *Fabozzi* (rightly, in light of the above burden of proof analysis) places the burden of proof on the defendant. *Fabozzi* holds that, in light of the legislative history cited in *LeBlanc*,

---

[2] Appointed Chief Justice September 15, 1999.

"it cannot find the plaintiff's objection was unreason-
able or not made in good faith . . . ." Id. Consequently,
the objection was, in effect, sustained.

Judge Corradino reaffirmed his *Fabozzi* analysis in
*Rosenfield* v. *Milner's Cafe*, Superior Court, judicial
district of Hartford-New Britain at Hartford, Docket No.
CV89368762 (December 6, 1993) (10 Conn. L. Rptr. 454).
In *Shepherd-Gotch* v. *Chioccola*, Superior Court, judicial
district of New London at Norwich, Docket No. 99597
(May 8, 1992) (6 Conn. L. Rptr. 371), Judge Hendel
agreed with the *Fabozzi* analysis and found an objection
apparently based on geographic inconvenience to be
reasonable. Similarly, in *Moore* v. *Minton*, Superior
Court, judicial district of New Haven, Docket No.
CV940364211S (October 8, 1998) (23 Conn. L. Rptr. 109),
Judge Silbert cited *Fabozzi* in fashioning a balancing
test, whereby the trial court would balance the plain-
tiff's statutory right to object against "the need to pre-
vent frustration of appropriate discovery efforts by
permitting plaintiffs to object to any physician sug-
gested by the defense without a good faith reason."
Id. Judge Silbert "perform[ed] that balancing act by
sustaining the plaintiff's objection and ordering that she
be examined by any of the physicians listed by the
plaintiff, the choice among whom may be made by the
defendant." Id.

B

Problems with the Pragmatic Approach

*Fabozzi* and its progeny are exemplars of the art of
common law judging, but it is difficult to reconcile their
pragmatic approach with the statutory text. The second
sentence of § 52-178a is categorical. Even in the absence
of legislative history, it is difficult to see how the uncon-
ditional language of that sentence can be made condi-
tional. In any event, the legislative history makes it
clear that the omission of a good faith requirement

was intentional. *Fabozzi*'s exposition of an "inherent" power of the court to order examination over the plaintiff's suggestion is actually descriptive of the power that the court enjoyed *prior* to the enactment of the statute. *Cook* v. *Miller*, supra, 103 Conn. 272. The second sentence of the statute was plainly designed to limit that power.

The statute's first sentence does not refute this analysis. Justice Parskey's reading in *Mulligan* demonstrates that the two sentences can coexist, with the categorical right given to the plaintiff in the second sentence qualifying the discretionary power given to the court in the first sentence.

## C

### The Constitutional Approach

Chief Justice McDonald has taken a more categorical approach. He has written that a strict reading of the second sentence of the statute "would deprive the defendant of his due process right to defend his property from a recovery of damages by the plaintiff by taking reasonable steps to ascertain the nature and extent of the plaintiff's injuries." *Pinto* v. *Walker*, Superior Court, judicial district of Waterbury, Docket No. 83777 (5 C.S.C.R. 159) (January 29, 1990). He has consequently required objecting plaintiffs to present "good reason to object to such an examination" and made it clear that asserted bias is not a good reason. Id.; accord *Miller* v. *Waterbury*, Superior Court, judicial district of Waterbury, Docket No. 097560 (9 C.S.C.R. 491) (April 18, 1994) (also by *McDonald, J.*).

## D

### Problems with the Constitutional Approach

Unfortunately, the precise grounds for the asserted due process right underlying *Pinto* are not made clear

in the opinion. Our Supreme Court suggested in *Cook* that the complete denial of a right to physical examination would raise due process problems; *Cook* v. *Miller*, supra, 103 Conn. 272; but the denial of a right to physical examination by a specific physician is much less sweeping. There are other interests to weigh in the balance, including the plaintiff's interest in personal autonomy, and the due process clause gives legislatures some flexibility in enacting experimental measures that balance these interests. See *Greenholtz* v. *Nebraska Penal Inmates*, 442 U.S. 1, 12–13, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979). Moreover, as the Supreme Court has often reminded us, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). In a well-known analysis, the Supreme Court has explained that, "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest . . . ." *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

It is appropriate to apply the three-pronged *Eldridge* analysis to the second sentence of § 52-178a. The private interest affected by the objection power conferred by this sentence is the defendant's interest in an accurate outcome of the litigation, an interest that the defendant hopes to achieve by having the plaintiff examined by a physician of his (the defendant's) choice. The risk of an erroneous deprivation of that interest depends almost entirely on the quality of the substitutes available to replace the vetoed physician. If the vetoed physician has unique or irreplaceable skills, the risk of erroneous

deprivation may be high. If the vetoed physician is one of many available physicians with similar skills, the risk of erroneous deprivation should be slight. Finally, the government's interest in enacting the statute is, at least as far as the text of the second sentence indicates, that of protecting the plaintiff's interest in bodily integrity and personal autonomy.

Given the flexibility that the Supreme Court has identified as the hallmark of due process, a faithful application of the second sentence of § 52-178a should not raise due process problems in the ordinary case. If the plaintiff vetoes a relatively small number of physicians but ultimately accepts a physician with skills similar to those of the vetoed physicians, the defendant's interest in an accurate outcome of the litigation should not be significantly affected. On the other hand, if the plaintiff vetoes a large number of physicians and effectively renders the defendant unable to obtain an independent physical examination by a physician with the requisite skills, a serious due process problem will arise. In that event, we would have something like the *Cook* scenario. The defendant would be denied the right to have a physical examination of the plaintiff's person and would be left "wholly at the mercy of such witnesses as the plaintiff sees fit to call . . . ." (Internal quotation marks omitted.) *Cook* v. *Miller*, supra, 103 Conn. 272. The result would be a gross denial of justice. Id.

The second sentence of § 52-178a must be construed with this limitation in mind. In the ordinary case, as already suggested, a faithful application of this sentence should be unproblematic. Even though an unqualified veto power is given to the plaintiff, experience teaches that a physician with the requisite skills will ordinarily be selected at the end of the day. Due process problems are likely to arise in one of two situations. In an unusual

case requiring unusual medical skills, a substitute physician with the requisite skills may be difficult or impossible to find. Alternatively, in a more garden-variety case, an unusually aggressive plaintiff might end up vetoing every physician in sight, effectively rendering the defendant unable to obtain an independent medical examination. This is the reductio ad absurdum alluded to by *LeBlanc.* In these situations, the court must intervene in order to prevent a due process violation. As described below, however, there are accepted techniques available to the court to at once accomplish this goal and, at the same time, faithfully construe the statute.

For the reasons just discussed Chief Justice McDonald's due process concerns should not, certainly in the ordinary case, cause the court to ignore or bypass the second sentence of § 52-178a. Under careful judicial management, that sentence and the due process clause can safely coexist.

## E

## The *Mulligan* Approach and its Problems Revisited

On the other end of the spectrum from Chief Justice McDonald, Judge Jones and Judge Trial Referee Hurley have found *Mulligan* to be persuasive and have sustained plaintiffs' objections based on asserted bias. *Agro* v. *Sender*, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. CV90030861S (March 11, 1991) (3 Conn. L. Rptr. 315) *(Jones, J.); Dittman* v. *Spotten,* Superior Court, judicial district of New Haven, Docket No. 541013 (March 16, 1998) (21 Conn. L. Rptr. 414) *(Hurley, J.T.R.).* For reasons already discussed, these decisions have the inestimable virtue of fidelity to the statutory text. Like *Mulligan,* however, they fail to explore alternative means of securing the ends of justice in ways consistent with the statutory text.

Because the court must be at once faithful to the statutory text and to the demands of procedural fairness, however, it is appropriate to explore the measures available to the court to ensure that each of these demands are honored in fact. It is helpful, in this regard, to refer to an analogy with substantial appellate jurisprudence: the psychiatric examination of defendants in criminal cases.

## VIII

## AN ANALOGY—PSYCHIATRIC EXAMINATIONS IN CRIMINAL CASES

Although the text of the Practice Book provisions governing the psychiatric examination of defendants in criminal cases differs from that of Practice Book § 13-11 (b), governing the physical examination of plaintiffs in civil cases, some of the same dynamics are at work in both cases. Because the relevant procedure in criminal cases has been the subject of extensive analysis, both in Connecticut and other jurisdictions, it is useful to refer to that jurisprudence by way of analogy.

The examination of defendants in criminal cases is, in Connecticut, governed by the rules of practice. There is no statutory counterpart of § 52-178a on the criminal side. Significantly, the relevant Connecticut rules are derived from the federal rules of criminal procedure. 4 L. Orland & D. Borden, Connecticut Practice Book Annotated: Superior Court Criminal Rules (2d Ed. 1996) § 760, p. 278, historical note. Consequently, the applicable federal jurisprudence on the problem at hand is extremely useful.

Practice Book § 40-19 provides in pertinent part that: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose by the prosecuting

authority." The judicial philosophy undergirding this rule is explained in *State* v. *Lovelace*, 191 Conn. 545, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984). "By raising the issue of his mental state at the time of the offense, by submitting to psychiatric examination by his own examiners and by presenting evidence as to his mental state, the defendant raise[s] the issue of his mental state for all purposes; thereafter he [can]not, by his silence, determine the ground rules for the determination of his claim." Id., 550–51. Thus stated, this philosophy is not far removed from that of *Cook* on the civil side. In each instance, the judicial authority intervenes to prevent a litigant from presenting what would otherwise be a one-sided version of the facts. The primary difference in Connecticut is that, on the civil side, the legislature has given the plaintiff the objection power contained in the second sentence of § 52-178a.

Practice Book § 40-19, like § 52-178a and Practice Book § 13-11 (b), does not address the question of what happens if a litigant refuses to comply with an order requiring submission to an examination. There is no reported Connecticut decision on this point. Fed. R. Crim. P. 12.2 (d), however, specifically addresses this question: "If there is a failure . . . to submit to an examination when ordered . . . the court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's guilt." Professor Wright terms this sanction "both appropriate and valid." 1 C. Wright, Federal Practice and Procedure (2d Ed. 1982) § 209, p. 756. Significantly, § 209 of Wright's treatise is specifically referred to in the commentary of the rules committee of the Superior Court to Practice Book § 40-19. 4 L. Orland & D. Borden, supra, § 760, p. 279.

Thus, in the criminal arena, the courts do not actually compel a litigant to undergo an examination, even an

examination that the court has "ordered." See *People v. Combes*, 56 Cal. 2d 135, 149–50, 363 P.2d 4, 14 Cal. Rptr. 4 (1961). A criminal defendant who refuses to submit to a court-ordered examination must, instead, face certain consequences. These consequences are *proportionate* consequences. The courts do not hold the recalcitrant defendant in contempt; they do not default him; and they do not even prohibit him from asserting any defense that he wishes to assert. Rather, the courts take other measures, prohibiting the defendant from putting on expert evidence of his own. By taking such measures, the courts at once respect the personal integrity of the litigant and avoid the *Cook* scenario of a trial wherein one party is left "wholly at the mercy of such witnesses as [the other party] sees fit to call . . . ." (Internal quotation marks omitted.) *Cook v. Miller*, supra, 103 Conn. 272. This is an example to which courts on the civil side, struggling to implement § 52-178a, can usefully refer.

## IX

### A WORKABLE SOLUTION

With this background, we can at long last turn to a workable solution to the problems posed by § 52-178a. The solution described here is doubtless not the only possible analysis. It does, however, have the virtues of adherence to the statutory text, respect for the requirements of due process, and the avoidance of the reductio ad absurdum posed in *LeBlanc*, that has concerned generations of trial court judges. The recurrent problems enumerated at the beginning of this opinion will first be addressed.

First, what is the relationship of the two sentences contained in the statute to each other? The only answer to this question that does not involve a torturing of the statutory text is that given by Judge Parskey in *Mulligan*. "The language of the first sentence speaks

in discretionary terms. The language of the second sentence speaks in terms of prohibition. . . . [I]t follows that the thrust of the second sentence is to eliminate discretion in those instances where a plaintiff interposes a written objection to a particular physician." *Mulligan* v. *Goodrich*, supra, 28 Conn. Sup. 13.

Second, is the right of a party to object to a physician unconditional, or is such an objection subject to conditions imposed by the court? The second sentence of the statute is unconditional on its face, and no condition should be imposed by the court. Efforts to import conditions into *this* statute are particularly misplaced, since the legislative history clearly reveals that the legislature intentionally removed a proposed requirement of good faith in a sweeping amendment that removed proposed restrictions on each party. Judicially imposed conditions on the right of a party to object are simply inconsistent with legislative history and statutory text. For these reasons, the right of a party to object to a physician is unconditional.

Third, if the right of a party to object is unconditional, how can the court avoid injustice to the opposing side? Prior decisions have avoided this problem, either by ignoring its existence (as is the case in *Mulligan* and its progeny) or by rendering it irrelevant by the imposition of conditions. This question must now squarely be addressed.

The analogy of psychiatric examinations in criminal cases points to the necessity of thinking outside the box. Alternatives to compulsion exist. The challenge facing the judicial authority is to design alternatives that at once respect the right of the plaintiff to object and the right of the defendant to have the litigation resolved in an accurate way. The following solution meets these requirements.

## A

The plaintiff has an unconditional statutory right to object to "any physician." She is entitled to object for any reason, including bias or personal dislike. Practice Book § 13-11 (b) merely requires that "the reasons for said objection" be stated in writing. But although the plaintiff has an unconditional ability to object, her enthusiasm for exercising this power irresponsibly will be tempered by the following two conditions.

## B

The defendant is entitled, at trial, to cross-examine the plaintiff on any objections he may have made during the course of the litigation. Cross-examination, as Wigmore famously said, "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1367, p. 32. The existence of this legal engine should encourage the plaintiff to exercise her power of objection in a responsible, or at least defensible, manner. If the plaintiff has a readily understandable reason, such as geographic remoteness, to object to a particular physician, she has nothing to fear from cross-examination. On the other end of the scale, if the plaintiff chooses to object to a dozen conveniently located board-certified physicians she is free to do so and then explain her qualms about each and every one of them to the jury. The jury will draw its own conclusions.

In addition to his right of cross-examination, the defendant should be permitted to argue to the jury that it should draw an adverse inference from the plaintiff's objections, just as he is permitted to make a similar argument based on a failure to call a witness who has been proven to be available to testify. See General Statutes § 52-216c. This ability should also act as a brake on any inclination that the plaintiff might have to abuse her statutory power to object.

Comment on the exercise of a legal right in the course of ordinary civil litigation is legally unproblematic. See *Mitchell* v. *United States*, 526 U.S. 314, 119 S. Ct. 1307, 1315, 143 L. Ed. 2d 424 (1999). Privee, represented by experienced counsel, candidly agreed at the hearing that it is appropriate for the court to articulate the rights of cross-examination and argument just described.

## C

If a plaintiff exercises her power of objection to the point where, as a practical matter, the defendant is rendered unable to obtain an independent examination by a physician with the requisite skills—either because the plaintiff has objected to a physician with unusual skills who cannot be effectively replaced or because the plaintiff ends up objecting to every physician in the book—more aggressive judicial measures are required. The court has a due process obligation to avoid the *Cook* scenario of a defendant left "wholly at the mercy of such witnesses as the plaintiff sees fit to call . . . ." (Internal quotation marks omitted.) *Cook* v. *Miller*, supra, 103 Conn. 272. The solution, however, is *not* to compel the plaintiff to submit to an examination. Under the second sentence of the statute, that cannot be done. The solution, rather, is to order that, if the plaintiff does not withdraw her objection, any expert evidence that she (the plaintiff) offers will be excluded. The plaintiff can still claim injury—she and other lay witnesses can take the stand and give factual descriptions of her injuries—but she will not be permitted to buttress her lay testimony with expert evidence. This proportionate response will even the playing field while avoiding the necessity of violating the statute by ordering an examination to which the plaintiff has objected.

It should be understood that the third step just described is to be used as a last, rather than a first,

resort. It should only be used if the defendant establishes that either the requisite medical skills are so rare or the plaintiff's objections so numerous that he has been left effectively unable to obtain an independent medical examination by a physician with the requisite skills. The judicial power to take the third step is, however, available in extreme cases, and the courts should not hesitate to exercise it in those cases.

## X

## RESOLUTION OF THE OBJECTION IN THIS CASE

With this background, the objection in this case can swiftly be resolved. The plaintiff objects to Barnett on the ground of asserted bias. The second sentence of § 52-178a allows her to do so. Although this is the plaintiff's second such objection, there is nothing about this garden-variety case to suggest that numerous other orthopedic surgeons with the requisite skills cannot be found in a geographic area (southern Connecticut) notable for its abundance of skilled physicians. The plaintiff will, however, be subject at trial to cross-examination and comment in final argument concerning her objection.

## XI

## CONCLUSION

The objection is sustained.